# United States Court of Appeals
## For the First Circuit

---

No. 03-2252

UNITED STATES OF AMERICA,

Appellee,

v.

RICHARD CASTELLINI,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph L. Tauro, U.S. District Judge]

---

Before

Selya, Circuit Judge,
Stahl, Senior Circuit Judge,
and Lynch, Circuit Judge.

---

James C. Rehnquist, with whom Sarah Heaton Concannon and Goodwin Procter LLP were on brief, for appellant.
Allison D. Burroughs, Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, was on brief, for appellee.

---

December 15, 2004

---

**LYNCH**, <u>Circuit Judge</u>.  Richard Castellini ("Castellini"), a married man with three children and no prior criminal record, was convicted of the crime of money laundering the proceeds of a bankruptcy fraud and conspiracy to money launder.  18 U.S.C. §§ 1956(a)(3), (c)(7)(D), (h).  In fact, the fraud was part of a sting operation by the government which ensnared at least six people.  All were associated with Anderson Ark and Associates ("AAA"), a Costa Rican company which moved money offshore through trusts in several countries before returning the "cleansed" (but diminished) funds to investors.

At trial, Castellini testified and portrayed himself as an innocent and naive dupe, not a criminal, who was misled by Richard Gonet ("Gonet"), the architect of the money laundering scheme and chief malefactor.  In fact, Castellini testified that he had been victimized by AAA and Gonet, who fleeced him of his own money.  It was Gonet who introduced Castellini to his troubled friend "Jim Mitchell," and asked him to do two financial transactions for Mitchell.  Unfortunately for Castellini, "Mitchell" was in fact James Dowling ("Dowling" or "Agent Dowling"), an undercover agent in a sting operation mounted by the Internal Revenue Service ("IRS") against Gonet.

The two financial transactions Castellini was asked to, and did in fact, engineer involved multiple offshore transfers of

Mitchell's money; Mitchell told Castellini the monies were being hidden from the bankruptcy court.

Castellini was tried alone. Gonet pled guilty (but did not testify for the government). A properly instructed jury found that Castellini had engaged in money laundering by conducting financial transactions involving property represented to be the proceeds of "specified unlawful activity," "with the intent . . . to conceal . . . the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(3).

On appeal, Castellini attacks his conviction and sentence.[1] First, he argues that the guilty verdicts on Counts One (for conspiracy to launder), Five, and Six (for the two instances of actual laundering) should be reversed for insufficiency of evidence. Second, he argues that he is entitled to a new trial for errors in the admission of coconspirator statements not meeting the requirements of United States v. Petrozziello, 548 F.2d 20, 22-24 (1st Cir. 1977).

The insufficiency argument is premised on the correct principle that the "proceeds" used for money laundering must be "proceeds" from a different illegal activity than the illegal activity of money laundering itself. United States v. Mankarious,

---

[1]The government also cross-appealed Castellini's sentence in No. 04-1339. On December 2, 2004, the cross-appeal was dismissed pursuant to Fed. R. App. P. 42(b) upon the government's motion.

151 F.3d 694, 705 (7th Cir. 1998). The argument is that the agent did not explicitly or implicitly "represent" that the money Castellini laundered was the proceeds of a specified "unlawful activity," but rather left Castellini with the sense that at most he was helping in the commission of a bankruptcy fraud, not that he was laundering the money derived from an ongoing bankruptcy fraud. While skillfully presented, existing case law dooms the argument. The Petrozziello arguments are also far from frivolous; but they, too, do not prevail, because the statements were admissible on other grounds or their admission was harmless.

Castellini was sentenced to twenty-one months' imprisonment; he was not ordered to pay a fine. Castellini attacks this sentence. He argues that the district court wrongly concluded that it did not have authority to consider granting him a downward departure for aberrant conduct. The record reflects that the district court knew it had the authority but did not think Castellini qualified to receive the reduction given that more than one transaction was involved. We have no jurisdiction to review that determination. Castellini also argues for the first time on appeal that his sentence violated Blakely v. Washington, 124 S. Ct. 2531 (2004). We reject that challenge because there was no plain error.

We set out the facts in the light most favorable to the jury's verdict. United States v. Glaum, 356 F.3d 169, 172 (1st Cir. 2004).

This case involves one of two prosecutions of the leaders of and persons associated with AAA.[2] AAA is a Costa Rican company which was the central marketing instrumentality for money laundering schemes to move the proceeds of illegal activity out of the United States via entities such as offshore trusts and then to repatriate such funds back to the United States so as to make the proceeds appear to be from legitimate sources. The conspiracy involved individuals spanning the continent from California to Massachusetts and from Washington to Costa Rica.

In December of 1998, after months of investigations, the Criminal Investigation Division of the IRS began a sting operation targeted at Michael Gonet, a Massachusetts resident who had been

_____

[2]AAA's leader, Keith Anderson ("Anderson"), was also involved in an organization called Global Prosperity and possibly another organization called Investors International. The record is not entirely clear as to what the relationships between the different organizations were, but it appears that Anderson left Global Prosperity at some point and founded AAA. Some of Castellini's business dealings described later on in this case were with coconspirators (notably Anderson and Roosevelt Drummer ("Drummer")) when they were involved with Global Prosperity. The government and Castellini, in their briefs, refer to AAA even when discussing transactions involving Global Prosperity. For ease of reference, therefore, AAA is used throughout this opinion to refer to both Global Prosperity and AAA.

promoting and marketing offshore trusts. Gonet did not work for AAA but ended up leading the sting operation to the leaders of AAA.

Agent Dowling first contacted Gonet by telephone on December 18, 1998. As "Jim Mitchell," Agent Dowling told Gonet a cover story that he ran a company named Pyramid Financial and owned three Burger King restaurants in the Phoenix, Arizona area. He said he had been sued for sexual harassment and was at risk of being forced into personal and corporate bankruptcy. As a result, he said he wanted to conceal some of his assets, namely, $100,000 in cash in a safe deposit box and $300,000 in a corporate bank account, from the bankruptcy court. Agent Dowling asked Gonet for help in concealing the funds from the bankruptcy court.[3] Gonet responded affirmatively. Dowling then asked, as a way to move the money, whether Gonet, who had a company in the Bahamas, could "send [Dowling] invoices and [Dowling] could pay the invoices." Gonet told Dowling that this was possible. In a second phone call on December 30, 1998, Gonet and Agent Dowling discussed in some detail how they might move the funds. Gonet told Dowling, "I have a

---

[3]Virtually all of the conversations between Agent Dowling and the targets of the sting operation, whether by telephone or in person, were recorded. In total, over 400 conversations were recorded. Approximately twenty-three of these recordings were played for the jury during the trial, and five of those recordings form the basis of a hearsay challenge that Castellini asserts here. Castellini testified about his conversations with Gonet to which Agent Dowling was not a party, but these were, for obvious reasons, not recorded.

-6-

[consulting] company that I can bill it through, you know, however much you want me to bill it."

On January 22, 1999, Gonet and Agent Dowling met in person for the first time. Agent Dowling gave Gonet $60,000 in cash, which he told Gonet he wanted to conceal from the bankruptcy court. Gonet moved the cash in installments to an offshore trust account and then back to an undercover bank account designated by Dowling at LaSalle Bank in Chicago in the name of Century Marketing. Gonet kept $9,000 as his fee for assisting Dowling. Castellini visibly entered the picture around March 11 or 12, 1999.

Castellini testified that he first met Gonet in 1997, when Gonet tried to sell Castellini an offshore trust. Castellini explained to Gonet that he already had the use of an offshore structure through a complex business organization ("CBO") set up for him by AAA. Castellini had been involved with AAA since 1996, when he began to buy tapes and attend seminars offered by AAA purporting to teach strategies for minimizing taxes. In 1997, as a way to reduce taxes from his own business, Castellini paid $28,000 to have the CBO set up for him by the head of AAA, Anderson, and AAA's head accountant, Drummer, an unindicted coconspirator who also became Castellini's accountant. In late 1997, in accordance with Drummer's advice, Castellini moved about $175,000 of his own money, listed as a bogus "management fee," through the CBO in order to reduce his taxes. For this service,

AAA charged him a 5% fee. These were the only times that Castellini used the CBO prior to his involvement in the activities in this case. Castellini also invested in various schemes offered by AAA members, but he lost money on all of them.

Castellini testified that Gonet called him on either March 11 or March 12, 1999, to ask him whether he still had his CBO and whether a third party would be allowed to use it. Gonet also explained Dowling's situation to Castellini. After Castellini consulted Drummer, he called Gonet back on March 15, 1999, and told Gonet that it was okay to use his CBO for somebody else's money.

Gonet and Agent Dowling spoke twice on March 16, 1999. Gonet told Dowling that he did not have the ability to move the money in the corporate bank account and he was concerned about the paper trail. Gonet did suggest to Dowling a way that the funds could be moved. He explained that he knew of a management company that could generate an invoice for non-existent "management consult[ing]" work. After Dowling paid the invoice with a check drawn on his corporate bank account, "the management company [would] take the funds, deposit them, and then move the funds offshore, and then ultimately back to wherever [Dowling] want[s] them." Gonet explained that the management company could move anything over $175,000 and still raise no suspicion for the high amount charged on the invoice because it did "this as a matter of business on a daily basis." Gonet said that the management

company, a "Nevada corporation . . . connected with a huge offshore conglomerate," would charge a fee of 25% of the funds moved in this way, and that Gonet's own fee would come out of that 25%. Gonet also assured Dowling that there would be no problems if the bankruptcy court questioned the management company because "they deal with this everyday. It's not like they're coming up with a . . . new defense . . . . They do it all the time."

Two days later, on March 18, 1999, Gonet and Dowling met in Florida. During this meeting, which was videotaped, Dowling gave Gonet another $40,000 in cash for Dowling to move offshore and then back into the LaSalle Bank account as before. Gonet also agreed to see if someone from the management company would speak with Agent Dowling directly about moving the funds in his corporate bank account.

On March 29, 1999, Gonet called Castellini, explained Dowling's situation in more detail, and asked Castellini to help Dowling move his money. Gonet in turn told Agent Dowling to expect a call from someone in the management company which they had been discussing.

The next day, Castellini called Agent Dowling and told him that Gonet had explained his situation to him. Castellini said that he could help Agent Dowling to retain control of and hide from the bankruptcy court the $300,000 in the corporate bank account by using Castellini's management company, RLC Management. RLC

Management is a Nevada company which Castellini controlled as part of his CBO. Castellini suggested that Agent Dowling give RLC Management checks drawn on Pyramid Financial's corporate account; RLC Management would then move the funds through its "majority shareholder," a domestic trust, offshore into a foreign trust, and thence through a series of offshore bank accounts under Castellini's and Gonet's direction until the funds were deposited back in the United States into a bank account controlled by Agent Dowling. (Castellini later explained that RLC Management is actually a Nevada partnership, and the domestic trust is a 99% partner in the partnership.) Castellini told Dowling that this whole structure was set up by "an attorney and a former IRS Agent" as a way to use "the laws that are in place to the fullest extent." Agent Dowling asked Castellini, "[H]ow do I get [the money offshore] back then?" Castellini responded, "[T]here's different vehicles for you to use [such as] . . . business corporations . . . or . . . trusts." Castellini also said, "[A]s far as you getting use of the funds afterwards, you . . . talk to Mike on [sic] that regard."

Consistent with what Gonet had said earlier, Castellini said he would invoice Pyramid Financial, Agent Dowling's company, for bogus "management . . . consulting fee[s]" so that the check would look like a "legitimate . . . business expense" even though no consulting work would be done for Dowling. Agent Dowling asked

Castellini, "[A]ll I do is just don't tell anyone about the transaction then?" Castellini replied, "[A]s far as you know, you hired us to do some consulting. . . .  [A]s the rest of it goes, you don't . . . know anything." Castellini told Dowling that he should not "tell the attorney" about the transaction because then Dowling would be told by the bankruptcy counsel to list the funds on the bankruptcy petition. Castellini confirmed that he could handle transactions between $175,000 and $200,000, and that the fee would be 25%, with Castellini taking care of Gonet's share. Agent Dowling consented to the "pretty steep" fee.

Castellini urged Dowling to delay the bankruptcy filing as long as possible because the trustee looks "pretty heavily" at transactions during the "last 90 days" and they did not want to "raise a red flag." In order to lessen the likelihood that the bogus transaction would be scrutinized, Castellini suggested that the invoices be backdated to February and advised Dowling to backdate the checks to RLC to be from the same time as the most recent group of checks he had written subsequent to the invoice date so that the false checks would not "stick out like a sore thumb." Castellini also offered to generate some "paperwork," such as a management report or proposal, as supporting documentation for the false invoices.

When Agent Dowling said he was a little "nervous" about the transactions because his attorney might, as he had in the past,

"jump[] up and down about, you know, bankruptcy fraud," Castellini told him, "[Y]ou're not committing . . . fraud if you hire a company to come in and . . . provide a service." But Castellini also acknowledged that no services would actually be provided. Agent Dowling asked Castellini, "[T]he only one knows [sic] about the 'service' will be you and me[?]" Castellini replied, "Right. They don't know, they don't have to know what happened to it." Agent Dowling asked Castellini, "[H]ave you ever done this before?" Castellini replied, "I've never had anyone come back and ask. . . . [I]t's never been questioned."

On April 8, 1999, Castellini called Dowling to initiate their plan, or, in his words, "do that invoice thing." Castellini told Dowling that he would make out an invoice in the amount of $30,000 dated February 1, 1999, and instructed Dowling to write out a check dated the same as the last time in February when Dowling thought he wrote out other checks. This invoice was sent on April 20, 1999.

On April 29, 1999, Castellini and Agent Dowling met at a restaurant in New Jersey, where Dowling gave Castellini a check for $30,000, dated February 8, 1999, and made out to RLC Management, in "payment" for the false consulting invoice Castellini had sent to Agent Dowling. After a two-hour lunch, the two engaged in the following conversation to justify the false invoice:

> Agent Dowling: So, and on this thing here,
> you've chosen 25 percent. Is there anything,

if something ever happens, you'll be on my team, and that's what the 25 percent -- That's kind of high.

Castellini: If something ever happens, whatever happens, they call me. And I can verify that we consulted. I mean, it's as simple as that. I'm not hiding anything. Did you and I just consult over business ventures and strategies?

Agent Dowling: We've been talking [sic] hiding my money.

Castellini: Did we discuss business strategies?

Agent Dowling: Sure.

Castellini: Yes. We're not lying, are we? Hiding your money is a business strategy, isn't it?

Agent Dowling: You've got a point. That's a great point.

Castellini deposited the $30,000 check into the RLC Management account and then transferred the money to the account of Sawtooth Enterprises, another AAA account available to Castellini. From the Sawtooth account, the funds -- minus the 25% fee for Castellini and Gonet -- moved through banks in Vienna, Austria, Costa Rica, the Isle of Man, the Bahamas, and ultimately, back to Agent Dowling's Century Market account in LaSalle Bank, Chicago. Castellini and Gonet both took part in directing the money transfers, and some of the accounts belonged to Gonet.

A few days later, during a telephone conversation on May 4, 1999, Castellini told Dowling that he had made up another false invoice for $170,000 dated March 15, 1999, which he was going to send out to Dowling. He asked Dowling to "trash the envelope" when he got the invoice because "it will have a postmark [much later

-13-

than the false date of the invoice] on it and stuff like that." Agent Dowling did receive such an invoice. However, due to a conversation that Dowling later had with Castellini's accountant, Drummer, nothing further was done with this false invoice.

In September of 1999, Castellini sent Dowling another invoice for "consulting services" backdated July 30, 1999, for $30,000, and Agent Dowling made out a check in that amount, backdated July 31, 1999, to RLC Management.[4] The money went on the same world-wide tour as the first $30,000. Ultimately, $22,500, representing the balance after the 25% fee, was deposited in the Century Market account.

Having himself successfully transferred $60,000 for Dowling, Castellini referred Dowling to Richard Marks ("Marks"), another coconspirator ultimately indicted along with Castellini, for further money transfers. Marks controlled Sawtooth Enterprises, which was one of the entities through which the $60,000 Castellini helped Dowling hide had moved. During a telephone conversation on October 18, 1999, Castellini told Dowling that he would "give Richard [Marks] the whole overview of what your situation is and, you know, what we've done so far." On November

---

[4]As the result of a conversation between Agent Dowling and Castellini's accountant, Drummer, who advised Agent Dowling to increase the wages he paid himself from his company, this check was drawn on Agent Dowling's personal account rather than the Pyramid Financial corporate account.

1, 1999, Castellini told Dowling that Marks had agreed to speak with Dowling directly.

Thereafter, Marks helped Agent Dowling hide $150,000 before referring Agent Dowling to Wayne Anderson. Wayne Anderson was the brother of Keith Anderson, and was himself also a leader in AAA. Ultimately, Wayne Anderson helped Dowling hide $100,000.

In late 2000, Pyramid Financial, Agent Dowling's fictitious company, filed its bankruptcy petition (the bankruptcy court was informed ahead of time that the petition was fictitious and the petition was ultimately dismissed). Agent Dowling and another IRS agent posing as his fiancée met Castellini and his wife in February 2001 to let Castellini know that bankruptcy had been filed and "to thank him for his help." Eight days after this dinner meeting, Castellini was arrested.

Castellini testified that he made no money from the transactions he conducted for Dowling because, out of the 25% fee, Gonet took 15% and left 5% each for AAA and Castellini, but AAA refused to send Castellini his share.

## II.

On March 29, 2001, a federal grand jury in the District of Massachusetts indicted Richard Castellini and codefendants Keith Anderson, Wayne Anderson, Karolyn Grosnickle, Richard Marks, and

-15-

Michael Gonet.[5]  Count One of the indictment charged Castellini

with conspiracy to launder money in violation of 18 U.S.C. §

1956(h); Counts Five and Six charged Castellini with money

laundering in violation of 18 U.S.C. § 1956(a)(3) based on the two

separate $30,000 transactions.  All of the charges were premised on

the fictional "specified unlawful activity" of bankruptcy fraud in

violation of 18 U.S.C. § 152.[6]  The relevant portion of the "money

laundering sting" statute, 18 U.S.C. § 1956(a)(3), provides that:

> Whoever, with the intent --
>     (A) to promote the carrying on of
> specified unlawful activity; [or]
>     (B) to conceal or disguise the nature,
> location, source, ownership, or control of
> property believed to be the proceeds of
> specified unlawful activity;
>         . . .
> conducts or attempts to conduct a financial
> transaction involving property represented to
> be the proceeds of specified unlawful activity
> . . . shall be fined under this title or
> imprisoned for not more than 20 years, or
> both.  For purposes of this paragraph . . . ,
> the term "represented" means any
> representation made by a law enforcement
> officer or by another person at the direction
> of, or with the approval of, a Federal

---

[5]On May 24, 2001, all charges against the Andersons, Grosnickle, and Marks were dismissed, on motion of the government, in favor of prosecution in the Eastern District of California. Gonet pled guilty to all charges against him in the District of Massachusetts.

[6]The statute imposes criminal liability on any person who "in contemplation of a case under title 11 [the Bankruptcy Code] . . . or with intent to defeat the provisions of title 11, knowingly and fraudulently transfers or conceals any of his property." 18 U.S.C. § 152(7).

-16-

official authorized to investigate or prosecute violations of this section.

Castellini's jury trial began on July 8, 2002. The government elected to proceed only on Counts One, Five, and Six. The trial lasted seven days.

During trial, the government played excerpts of twenty-three recorded conversations between Agent Dowling and members of the conspiracy. Of these, five conversations were with Gonet, thirteen were with Castellini, four were with Marks, and the last one was with Grosnickle. One of the conversations involving Gonet was the March 18, 1999 meeting in a Florida hotel room between Agent Dowling and Gonet, and the government played a videotape recording of the meeting.

At the outset of the government's case, the district court allowed the defense to lodge a continuing hearsay objection to the admission of each of these recordings of conversations between Agent Dowling and the alleged coconspirators. The defense renewed this objection on the third day of the trial. The objections were overruled by the trial court but preserved for appeal. The defense also moved for a mistrial on the basis of the admission of this evidence after the government rested, at the close of all the evidence, and after the verdict. These motions were denied.

On July 19, 2002, the jury found Castellini guilty on all three counts. At his August 12, 2003 sentencing hearing,

Castellini moved for a downward departure for "aberrant behavior" under U.S. Sentencing Guidelines Manual § 5K2.20. Castellini argued that the charged conduct was an "eight-month lapse in a 38-year life of good citizenship." The district court denied the motion, saying, "I think that this is a departure in terms of his behavior. You know, that eight-month period . . . is like a black hole in an otherwise reasonable life. But I don't believe that it adds up to the downward departure that you are talking about." The court sentenced Castellini to twenty-one months' imprisonment but did not impose a fine and stayed Castellini's sentence pending appeal.

Castellini timely filed his notice of appeal on August 19, 2003.

**III.**

We address in turn each of Castellini's claims on appeal.

A. Sufficiency of the evidence

On challenges to sufficiency of the evidence, we take all the evidence and inferences in the light most favorable to the verdict and ask whether a rational factfinder could find, beyond a reasonable doubt, that the prosecution successfully proved the essential elements of the crime. Jackson v. Virginia, 443 U.S. 307, 319 (1979); United States v. O'Brien, 14 F.3d 703, 706 (1st Cir. 1994).

The essential elements of the money laundering sting statute are:

> Whoever, with the <u>intent</u> --
> (A) to <u>promote</u> the carrying on of <u>specified unlawful activity</u>; [or]
> (B) to <u>conceal</u> or disguise the nature, location, source, ownership, or control of property <u>believed to be the proceeds of specified unlawful activity</u>;
> . . .
> <u>conducts</u> or attempts to conduct <u>a financial transaction</u> involving property <u>represented to be the proceeds of specified unlawful activity</u> . . . shall be fined under this title or imprisoned for not more than 20 years, or both.

18 U.S.C. § 1956(a)(3) (emphasis added). The statute further defines the term "represented" as "any representation made by a law enforcement officer or by another person at the direction of, or with the approval of, a Federal official authorized to investigate or prosecute violations of this section." <u>Id.</u>

A money laundering defendant must act with a certain type of intent. One sort of requisite intent is the intent to "<u>conceal</u> . . . the nature, location, source, ownership, or control of property <u>believed to be the proceeds of specified unlawful activity</u>." <u>Id.</u> (emphasis added). The intent requirement is bolstered by the requirement that the financial transactions in question must involve "property <u>represented to be</u> the <u>proceeds</u> of specified unlawful activity." <u>Id.</u> (emphasis added).

On first read, it might seem odd to refer to money laundering of "proceeds" from a bankruptcy fraud. After all,

-19-

bankruptcy fraud involves hiding the debtor's own money from the bankruptcy court, and unlike other types of fraud does not involve wrongfully taking money ("proceeds") from others by deception. Proceeds are usually defined as "[t]he value of land, goods, or investments when converted into money" or "the amount of money received from a sale." Black's Law Dictionary 1242 (8th ed. 2004). Nonetheless, Congress expressly included bankruptcy fraud as one of the predicate crimes producing "proceeds" which could be money laundered. 18 U.S.C. § 1956(c)(7)(D). It is not difficult to think of bankruptcy fraud in terms similar to the other types of fraud -- money which is hidden from the bankruptcy court is, in a sense, taken from the creditors. In any event, the case law as well as the statute establishes that bankruptcy fraud can produce "proceeds." See United States v. Richard, 234 F.3d 763, 770 (1st Cir. 2000). The "sting" portion of the money laundering statute means that the "proceeds" can be part of a fiction the government creates.

Castellini argues that the agent never represented the money to be the proceeds of unlawful activity, and so no rational jury could conclude that element of the crime was proven. The argument is based on the general rule that the money laundering statute is meant to punish a separate offense from the underlying "specified unlawful activity," and thus, it criminalizes separate financial transactions involving the funds derived from such

illegal activity. See United States v. Mankarious, 151 F.3d 694, 705 (7th Cir. 1998) ("Money laundering requires proceeds of a discrete predicate crime. That predicate crime must have produced proceeds in acts distinct from the conduct that constitutes money laundering."); United States v. LeBlanc, 24 F.3d 340, 346 (1st Cir. 1994) (Money laundering is a "separate crime distinct from the underlying offense that generated the money.").

In the analogous context of 18 U.S.C. § 1957, which criminalizes money laundering of "criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity,"[7] § 1957(a), we have reversed convictions when the government did not prove that the money involved in the alleged laundering transactions was the proceeds of a separate specified unlawful activity. See United States v. Carucci, 364 F.3d 339, 345-46 (1st Cir. 2004) (conviction under 18 U.S.C. § 1957 cannot be upheld because government failed to introduce sufficient evidence to allow a rational jury to conclude that defendant laundered money

---

[7]Although 18 U.S.C. § 1957 uses the phrase "criminally derived property" instead of the phrase "proceeds of specified unlawful activity," which is used in 18 U.S.C. § 1956, courts have interpreted the two to be equivalent and have read cases decided under § 1957 as persuasive authority in the interpretation of cases arising under § 1956. See Mankarious, 151 F.3d at 705 n.1; United States v. Savage, 67 F.3d 1435, 1442 (9th Cir. 1995); see also 18 U.S.C. § 1957(f)(2) (defining "criminally derived property" to be "any property constituting, or derived from, proceeds obtained from a criminal offense") (emphasis added).

-21-

which was "proceeds" from gambling, extortion, or drug trafficking, the underlying specified unlawful activities).

The two issues of the agent's representation and the nature of the proceeds are connected. We understand Castellini to argue that if the representations had been nothing more than that the agent wanted Castellini to take property and hide it from the bankruptcy court, then that would not be a representation that property was the "proceeds" of bankruptcy fraud. Castellini argues that the representation then would be only about property, the concealment of which constituted the bankruptcy fraud, but not about property which was itself the proceeds of bankruptcy fraud.

Castellini supports his position with two types of arguments. First, he argues that all of Agent Dowling's representations were that the funds were from legitimate business activities, and Castellini had no reason to infer otherwise. He cites the rule that the government must at least prove "that an enforcement officer or authorized person made the defendant aware of circumstances from which a reasonable person would infer that the property was [illegal] proceeds." United States v. Kaufmann, 985 F.2d 884, 893 (7th Cir. 1993). The government agent need not expressly state that the funds are proceeds of illegal activity if that is the natural inference to be drawn. See, e.g., United States v. Puche, 350 F.3d 1137, 1143 (11th Cir. 2003); United States v. Jensen, 69 F.3d 906, 911 (8th Cir. 1995); see also

-22-

Kaufmann, 985 F.2d at 893-94 (agent's representation to defendant that the purchaser was a marijuana dealer, interested only in paying cash for a car, and wanted the car to be registered in another person's name was sufficient to satisfy the "represented" and "proceeds" elements of money laundering even absent express statements that the cash was drug proceeds); United States v. Marbelt, 129 F. Supp. 2d 49, 54 (D. Mass. 2000) (representation need only be specific enough to lead reasonable person in defendant's position to infer funds derived from specified unlawful activity).

Castellini has a second argument as well. He argues that he could not have violated the bankruptcy fraud statute because the statute criminalizes the act of (not merely the intention of) transferring or concealing funds, and at the time Agent Dowling gave Castellini money, there had been no specified unlawful activity which produced the requisite proceeds of an illegal activity for money laundering. In other words, Castellini argues, his actions were nothing more than aiding and abetting the commission of the underlying bankruptcy fraud; those actions could not simultaneously have constituted money laundering.

We start with the representations argument. A "representation" is "the manifestation to another that a fact . . . exists." Black's Law Dictionary 1327 (8th ed. 2004). It is true that the initial representation made was that Agent Dowling wanted

to hide from the bankruptcy court his legitimately earned money. Specifically, that Castellini would receive the money in a legitimate manner. Agent Dowling approached Castellini and said that he had a successful business and wanted Castellini to help him hide money from the bankruptcy court; and then gave the money to Castellini to hide from the bankruptcy court, itself a fraud.

Agent Dowling's representations also went far beyond the initial transfer of money to an agreement that there would be a series of steps taken after Castellini received the funds. The steps discussed in the conversations were classic money laundering. In their conversations, Castellini described to Agent Dowling in detail the steps that would be taken to siphon the funds offshore and move them around before they would be made available again to Agent Dowling. Dowling represented that this was acceptable. Castellini explained the division of work between himself and Gonet in the scheme, and the fee that he and Gonet would charge. Dowling represented that he understood and agreed to the scheme and the "pretty steep" fee.

Indeed, the evidence shows that Castellini did conclude, from the representations, that he would be handling the proceeds of an illegal activity. For example, Castellini acknowledged to Agent Dowling, within their first conversation, that exchanging a check for a false invoice while providing no actual consulting service would be fraud. Castellini told Agent Dowling that the money

Dowling was going to give to Castellini would not have to be listed in the bankruptcy petition because "[o]nce you give it to me, it's no longer yours." Furthermore, in a later conversation on June 25, 1999, Castellini demonstrated his awareness that he was handling "tainted money" by telling Agent Dowling, "[Y]ou're not going to use the word 'laundering' are you? . . . It just makes it sound so dirty. I mean, but what we do --."

Secondly, Castellini argues that even if he transferred funds around the world, what he did was simply aiding and abetting bankruptcy fraud and could not simultaneously be money laundering. The argument has some attraction, particularly in light of the doctrine, broadly stated, that money laundering requires there to be proceeds of illegal activity and cannot be the same as the illegal activity which produces the proceeds. The money laundering statutes "interdict only the financial transactions . . . , not the anterior criminal conduct that yielded the funds allegedly laundered." United States v. Cabrales, 524 U.S. 1, 1 (1998); see also Mankarious, 151 F.3d at 704 ("A money launderer must obtain proceeds before laundering can take place.") (emphasis in original). Castellini relies on the fact that the indictment's allegations can be read to mean that Agent Dowling's delivery of the two $30,000 checks to him initiated the money laundering, from which Castellini argues that it is a logical necessity that the

same acts "cannot simultaneously have <u>completed</u> the underlying bankruptcy fraud necessary for money laundering to have occurred."[8]

Castellini uses the concept of non-simultaneity. The concept, though, hides a distinction, one which was pointed out in <u>Mankarious</u>. The strict emphasis on time should not obscure the real principle of these cases. It is not a requirement that the underlying crime must be fully completed before any money laundering can begin. It is simply that the non-simultaneity principle means that "money laundering criminalizes a transaction in proceeds, not the transaction that creates the proceeds." <u>Mankarious</u>, 151 F.3d at 705. The cases cited by Castellini stand for the rule "that the predicate offenses must produce proceeds before anyone can launder those proceeds," but that does not require the two crimes involved to be entirely separate in time. <u>Id.</u>

"Proceeds" of an illegal activity may be created before the completion of an underlying on-going crime. <u>Id.</u> Here, "proceeds" of bankruptcy fraud were created as of the time Castellini accepted the checks from the agent in order to hide them from the bankruptcy court. There are variations on the theme. Some types of fraud, like bank and wire fraud, usually create

_____

[8]Under the current (2004) Sentencing Guidelines, Castellini faces a higher penalty for money laundering than for bankruptcy fraud. The base offense level for money laundering is 8. U.S. Sentencing Guidelines Manual § 2S1.1(a)(2). The base offense level for bankruptcy fraud is 6. <u>Id.</u> at § 2B1.1(a)(2).

proceeds only on execution of the first scheme, while mail fraud can create proceeds before a mailing takes place. Id. Similarly, the first of multiple efforts to hide a series of assets from the bankruptcy court may create proceeds of illegal activity. See Richard, 234 F.3d at 770 (proceeds laundered in money laundering may result from "a completed phase of an ongoing offense") (quoting United States v. Conley, 37 F.3d 970, 980 (3d Cir. 1994)) (emphasis in Richard); United States v. Butler, 211 F.3d 826, 830 (4th Cir. 2000) (bankruptcy fraud committed and funds became "criminally derived property" when debtor gave check to innocent third party so that funds would be held on debtor's behalf and concealed from the bankruptcy court; money laundering occurred when funds were used to purchase cashier's checks a year later, even if these acts were also a further phase of bankruptcy fraud). From that point of view, the fact that Castellini's additional actions after initially receiving the funds (moving the funds around, and so forth) could have been charged as either money laundering or aiding and abetting an on-going bankruptcy fraud could be thought to be irrelevant. Once the basic elements of the underlying crime are sufficiently far along to create proceeds, the logic goes, the money becomes proceeds of illegal activities and it can be laundered.

There may be a case in which the line between bankruptcy fraud and money laundering is so close that the element of showing that the funds are proceeds of an illegal activity or the element

of representation is not met.  Arguably, a case where a defendant merely received money to be hidden from the bankruptcy court in his account and did nothing more with it might be such a situation. That is not this case.  Here the further activities Castellini discussed and engaged in after initially receiving the money were archetypal money laundering.  While the "classic" money laundering case involves a drug trafficker "acting with the complicity of a banker or other person in a financial institution [and] deposit[ing] the drug proceeds in a bank under the guise of conducting a legitimate business transaction," United States v. Johnson, 971 F.2d 562, 568 (10th Cir. 1992), the Money Laundering Control Act of 1986, which enacted 18 U.S.C. § 1956, "prohibits a much broader range of conduct than just the 'classic' example of money laundering." Johnson, 971 F.2d at 569.  The definitions and language of the statute indicate that "Congress intended to criminalize a broad array of transactions designed to facilitate numerous federal crimes," LeBlanc, 24 F.3d at 346, including bankruptcy fraud. See 18 U.S.C. § 1956(c)(7)(D).  It is clear from the legislative history that Congress's purpose in enacting § 1956 was to close "the gap in the criminal law with respect to the post-crime hiding of the ill gotten gains." Johnson, 971 F.2d at 569 (quoting United States v. Edgmon, 952 F.2d 1206, 1213 (10th Cir. 1991)).  Congress had reason to be concerned.  The money laundering of the proceeds of an underlying illegal activity may make the

-28-

underlying crime more difficult to detect or to prove. And Congress wanted to curtail the separate market of criminal activity which money laundering represents.

The transactions here were within "the full contemplation of Congress when it enacted [§ 1956]." LeBlanc, 24 F.3d at 347. Castellini asked Dowling to start out with a smaller check to avoid arousing the suspicion of the bankruptcy court; he invoiced Dowling for fictitious "management consulting" work; he received the checks; and he then negotiated the checks obtained from the bankruptcy fraud, sending the money, minus their fee, to tour the world under his and Gonet's guidance. Cf. id. ("[Defendant] asked gamblers to structure their checks in amounts less than $10,000; he asked that the gamblers make the checks payable to fictitious payees; he received the checks; and he then negotiated the checks."). His conduct was at the heart of what Congress sought to criminalize. At least on these facts, where a reasonable listener could easily infer the proceeds were from a bankruptcy fraud, which produced proceeds at the time, and the further activities contemplated and actuated were typical of money laundering, a reasonable jury could find the defendant guilty of money laundering beyond a reasonable doubt.

Castellini points to United States v. Anderson, 371 F.3d 606 (9th Cir. 2004), which reversed the conviction of Wayne Anderson, a coconspirator indicted and charged along with

Castellini in the same sting operation but tried separately in the Eastern District of California. Anderson does not provide support for Castellini. Anderson involved convictions on two counts: one count of conspiracy to launder money premised on the underlying unlawful activity of bankruptcy fraud (which was based on the same cover story that Agent Dowling used on Castellini), and a second count of money laundering premised on the underlying unlawful activity of bank fraud in violation of 18 U.S.C. § 1344(2). Anderson, 371 F.3d at 608-09. The Anderson court affirmed the conviction for the conspiracy to commit money laundering count based on bankruptcy fraud but reversed on the other money laundering count based on bank fraud. Id. at 612. Anderson supports the conclusion here; indeed, it affirmed the money laundering conviction based on bankruptcy fraud. Id. at 610.

The reversal in Anderson of the money laundering conviction based on bank fraud does not help Castellini. Unlike bankruptcy fraud, bank fraud has as an element that the money be attained from a federally chartered or insured financial institution. Id. at 612. Anderson held that no such representation had been made or could be inferred from the agent's very different representation that the funds had been fraudulently received from individual clients. Id. Noting that the government could easily have structured the sting to make the needed representation, the court held that the government had failed to

meet its burden of proof. <u>Id.</u> Here, the prosecution did not make such a mistake.

## B. Admission of coconspirator statements

Castellini also argues that a new trial is necessary because the district court erred by admitting prejudicial coconspirator statements made by Gonet in taped conversations. More specifically, the claims are that the district court (1) never made explicit findings regarding the existence of the conspiracy and whether the statements were made in furtherance of the conspiracy, and (2) admitted numerous statements by Gonet that were not made during and in furtherance of the conspiracy. <u>See</u> <u>United States</u> v. <u>Petrozziello</u>, 548 F.2d 20, 23 (1st Cir. 1977).

Federal Rule of Evidence 801(d)(2)(E) provides that "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy" is not hearsay evidence and is admissible for the truth of the matter asserted. In this Circuit, coconspirator statements are only admissible under Rule 801(d)(2)(E) if the trial court finds it "more likely than not that the declarant and the defendant were members of a conspiracy . . . and that the statement was in furtherance of the conspiracy." <u>Petrozziello</u>, 548 F.2d at 23.[9]

_____

[9]The ellipsis replaces the words "when the hearsay statement was made." <u>Petrozziello</u>, 548 F.2d at 23. This restriction was dicta in <u>Petrozziello</u>, and was withdrawn by <u>United States</u> v. <u>Baines</u>, 812 F.2d 41, 42 (1st Cir. 1987) (affirming admission of statements of coconspirators made before defendant joined the

-31-

We will sustain a trial court's determination of admissibility under Rule 801(d)(2)(E) unless the ruling is clearly erroneous. United States v. Portela, 167 F.3d 687, 703 (1st Cir. 1999).

> This deferential standard of review places a heavy burden on a defendant seeking to overturn a trial court's Petrozziello ruling: A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.

United States v. Newton, 326 F.3d 253, 257 (1st Cir. 2003).

Castellini limits his challenge to those out-of-court statements by Gonet which were made before March 30, 1999. His challenge is thus confined to the following five conversations between Gonet and Agent Dowling: 1) the December 18, 1998 telephone call; 2) the December 30, 1998 telephone call; 3) the two telephone calls on March 16, 1999; and 4) the videotaped meeting in Florida on March 18, 1999.

We dispose of the procedural aspect of Castellini's challenge quickly. The record shows that the district court did, in fact, make Petrozziello rulings, though not as explicitly as Castellini would like. In accordance with the procedures set out in United States v. Ciampaglia, 628 F.2d 632, 638 (1st Cir. 1980),

conspiracy). See United States v. Portela, 167 F.3d 687, 703 n.13 (1st Cir. 1999) (recognizing modification of Petrozziello by Baines).

at the start of the government's presentation of evidence, Castellini requested and was allowed a continuing objection to the admission of Gonet's out-of-court statements. Castellini renewed his objection at the start of the next day of the trial, and the district court replied, "That is on the record. I think there is plenty to justify the conversations coming in . . . ." The district court also reminded the defendant to renew the objection at the close of the government's case. At the close of all evidence, Castellini asked the district court to make the Petrozziello findings. The district court responded, "I make those findings for the record." Castellini did not ask the court to be more specific. After the charge to the jury, Castellini again asked the court to make the Petrozziello findings, and the district court said, "I did. I told you at the end of the case, just consider them made." Castellini's counsel said, "Okay," and made no other comment, request, or objection.

The district court's Petrozziello findings, though not explicitly separated out, necessarily entail that the district court found by a preponderance of the evidence that there was an existing conspiracy at the time Gonet made the statements, that Castellini was involved in the conspiracy at some point, and that the statements were made in furtherance of the conspiracy. See Petrozziello, 548 F.2d at 23. This conclusion is also supported by other rulings made by the district court. Castellini twice moved

for a mistrial on the ground that there was no conspiracy at all until Castellini joined on March 30, 1999, and that thus Gonet's out-of-court statements before that date were inadmissible hearsay which was prejudicial to Castellini. The government countered that the record indicated, by inference, that Castellini and Gonet had been talking about Agent Dowling's situation before March 30, 1999, and at the time the challenged statements were made, a conspiracy involving Gonet and Castellini did exist.[10] The trial judge accepted the government's arguments and denied the motions.

The government's argument that there was a conspiracy between Gonet and Castellini before March 30, 1999, is based on several components. When Castellini first spoke to Dowling on March 30, Castellini already knew what Dowling had told Gonet earlier. That, by itself, does not establish a conspiracy between Gonet and Castellini on each of the earlier dates. The government also relies on the corroboration given to Gonet's pre-March 30 statements about the management company and the methods by which

---

[10]The government did not argue at trial that there was a conspiracy between Gonet and the other conspirators, and that Castellini, even if he did not join the conspiracy until March 30, became responsible for the earlier statements regardless of his awareness of the earlier conduct. See Baines, 812 F.2d at 42. There was also no evidence in the pre-March 30 conversations that Gonet made the statements in furtherance of a much larger umbrella conspiracy to which both Gonet and Castellini belonged. Cf. United States v. Marino, 277 F.3d 11, 25-26 (1st Cir. 2002) (out-of-court coconspirator statements admissible where declarant and defendant were members of larger umbrella conspiracy even though they belonged to rival factions).

the money would be laundered by Agent Dowling's later conversations with Castellini about the transactions and the subsequent transactions themselves.[11] The entire false-invoice scheme was carried out by Castellini essentially as Gonet had explained it to Agent Dowling on March 16, 1999. Also on March 16, 1999, Gonet mentioned a third party, a Nevada corporation, and the evidence showed that RLC Management, Castellini's company, turned out to be a Nevada partnership. Further, Castellini admitted that he had told Gonet of his AAA-derived CBO in 1997, and Gonet asked Castellini on March 11 or 12 of 1999 whether his CBO could be used for a third party. Castellini counters that there is no evidence that there was any agreement between Castellini and Gonet at the time of these pre-March 30 conversations; Gonet might have come up with the plan on his own and simply instructed Castellini later to carry it out. Also, Castellini argues, there were material differences in the transactions described by Gonet and those carried out by Castellini.

---

[11]The agreement between Agent Dowling and Gonet cannot be a conspiracy because there can be no conspiracy as a matter of law solely between a defendant and a government agent. United States v. Giry, 818 F.2d 120, 126 (1st Cir. 1987) ("[I]n situations where the conspiracy involves only [one] defendant and a government [agent,] . . . there can be no conspiracy because it takes two to conspire and the government [agent] is not a true conspirator.") (quoting United States v. Martino, 648 F.2d 367, 405 (5th Cir. Unit A June 1981) (internal quotation marks omitted) (second alteration in Giry)). This is why the focus is on the existence of a conspiracy involving Gonet and some other coconspirator, most likely Castellini.

Indeed, Castellini argues, in Gonet's December 18 and December 30 conversations with Agent Dowling, Gonet said he owned the company which might be used to produce the false invoices and did not say a third party was involved. In the March 16 conversation, Gonet mentioned a Nevada corporation but also stated he had not yet involved anyone from the corporation and hoped to talk with someone that night. Further, on March 18, Gonet said that he still had not obtained agreement from anyone at the corporation.

The government's case is strongest as to the existence of the conspiracy as of the March 16 and 18 conversations, but hardly compelling even as to those. On this record, whether the district court's ruling that there was a conspiracy on the dates before March 16 constituted clear error is a close call. We need not decide that question for several reasons.

First, some of the statements are admissible on grounds other than the coconspirator exception under Rule 801(d)(2)(E). For example, the December 18, 1998 conversation was admissible for a purpose other than to prove the truth of the matter asserted therein and thus would not be hearsay. This conversation simply showed the initial contact between Gonet and Agent Dowling, and provided background and context for understanding the subsequent transactions and investigative steps targeted at Gonet and Castellini. See United States v. Cintolo, 818 F.2d 980, 999 (1st

Cir. 1987) (out-of-court statements regarding conversation between FBI agents and a witness were admissible to provide context and background even though defendant did not ask for a limiting instruction). The same applies to the conversation of December 30, 1998, during which Gonet said, "I have a company that I can bill it through." This also provided context and background to understand subsequent references to "the company you talked about" as the laundering scheme was discussed in subsequent conversations.

Second, even if there were error in admitting some of the later conversations, any error was harmless. "The essential inquiry in harmless error review is whether the improperly admitted evidence likely affected the outcome of trial." United States v. Torres-Galindo, 206 F.3d 136, 141 (1st Cir. 2000). "[A] harmlessness determination demands a panoramic, case-specific inquiry considering, among other things, the centrality of the tainted material, its uniqueness, its prejudicial impact, the uses to which it was put during the trial, the relative strengths of the parties' cases, and any telltales that furnish clues to the likelihood that the error affected the factfinder's resolution of a material issue." United States v. Sepulveda, 15 F.3d 1161, 1182 (1st Cir. 1993).

Castellini does argue he was prejudiced. For example, Castellini contends that he was prejudiced by two references Gonet made to money laundering during the March 18, 1999 meeting.

Gonet's first reference was to his own scheme for sending money via UPS around the country as "documents" and has nothing to do with Castellini. Second, Gonet said in the conversation that accepting Agent Dowling's money and depositing it into an offshore account could be considered money laundering. Against this is the fact that the evidence of Castellini's own illicit transactions was overwhelming. And the second reference is no more prejudicial to Castellini than Castellini's own statement: "You're not going to use the word 'laundering' are you? . . . . It just makes it sound so dirty . . . ." At most, Gonet's earlier conversations were "cumulative and the weight of the additional [non-hearsay] evidence overwhelming." United States v. LiCausi, 167 F.3d 36, 50 (1st Cir. 1999).

Castellini next argues that he was prejudiced because the content of some of Gonet's statements at the March 18, 1999 meeting was "shocking" in comparison to the "gentler tone" of the other testimony and gave rise to the negative impression that Castellini was a hard core criminal. In order to assure Agent Dowling that his funds would be safe with Castellini, Gonet told Agent Dowling at the March 18 meeting that "these people" (who would be handling Dowling's money at the management company) were more "hard core," more "hard line," and "a lot tougher" than Gonet, and that "these people" could "stand the heat." The jury could evaluate Castellini themselves: Castellini testified at length and told the jury that

he was very naive and gullible, and he elicited laughter for his portrayal of himself as a "[c]abana boy" because everyone at work asked him to do things.

Finally, Castellini argues that Gonet's statements only inculpated Castellini, not other conspirators, so that Castellini appeared to be more important to the conspiracy than he actually was. The prosecution in this case is of Castellini, not other conspirators, and the jury in this trial heard evidence about others involved in the money laundering. There is no basis for a new trial.[12]

**IV.**

A. Sentencing: Downward departure for "aberrant behavior"

Castellini also charges the district court with error in sentencing him, asserting that the court ruled as a matter of law that it had no discretion to grant Castellini's request for a downward departure pursuant to U.S. Sentencing Guidelines Manual § 5K2.20. We reject this claim.

---

[12]Castellini also argues that the recordings involving Gonet and Agent Dowling took up most of the second day of trial and "assume[d] a prominent role in the government's case." In actuality, the second day of trial lasted only a half day, and although Agent Dowling's testimony took up the whole time, the bulk of the testimony was not focused on the recordings, none of which was particularly long. These five relatively short recordings cannot be said to have assumed a particularly prominent role in light of the twenty-three recordings used in total and the other evidence introduced by the government during the course of a seven-day trial.

When a district court exercises its discretion to refuse to grant a downward departure, that decision is not reviewable. United States v. Mejia, 309 F.3d 67, 70 (1st Cir. 2002). Appellate review is available for refusal to depart if the district court misunderstood the scope of its authority under the guidelines and mistakenly believed that it lacked the discretion to depart. United States v. Rivera-Rodriguez, 318 F.3d 268, 275 (1st Cir. 2003).

The departure was sought under the November, 2002 version of § 5K2.20, which states, in relevant part, "A sentence below the applicable guideline range may be warranted in an extraordinary case if the defendant's criminal conduct constituted aberrant behavior." The commentary to the guideline defines "aberrant behavior" as "a single criminal occurrence or single criminal transaction that (A) was committed without significant planning; (B) was of limited duration; and (C) represents a marked deviation by the defendant from an otherwise law-abiding life." U.S. Sentencing Guidelines Manual § 5K2.20, cmt. n.1 (2002).

At the sentencing hearing, the district court made its initial ruling on Castellini's "aberrant behavior" departure motion by stating:

> I don't think there is sufficient evidence for me to give a downward departure for aberrant behavior, although . . . I think that the conduct involved was an extraordinary departure from what had been this man's life.

> My concern is that . . . that is not enough to permit me to find him having committed something because of aberrant behavior.

Castellini then argued that the court should grant the departure because it had found Castellini's behavior "to be an extraordinary departure."  The district court responded:

> What I said to you is that I think that this is a departure in terms of his behavior. You know, that eight-month period, you know, is like a black hole in an otherwise reasonable life.  But I don't believe that it adds up to the downward departure that you are talking about.
> . . . .
> I don't think this really is a single criminal offense.  I think that it is an episode.
> . . . .
> [H]ere we had, at least arguably, two offenses . . . eight months apart, both for $30,000.  So it isn't one.  It is not a single.

From the quoted passages, it is clear that the district court understood that it had the authority to depart, but decided that departure was not warranted because there was insufficient evidence to justify it.  In particular, the district court denied the departure because the multiple transactions in an elaborate scheme involving a network of offshore entities over an eight-month period put it outside the purview of the single occurrence/transaction without advanced planning and of limited

duration contemplated by the guideline.[13]  See Rivera-Rodriguez, 318 F.3d at 275-76.  That decision is not subject to review.

B.  The Blakely challenge

Castellini finally argues, for the first time on appeal, that his sentence should be vacated and the case remanded for resentencing because the jury did not make a factual determination regarding the amount of laundered funds attributable to him under the sentencing guidelines, as he contends is required under Blakely v. Washington, 124 S. Ct. 2531 (2004).  Because Castellini did not raise this argument before the district court, review is for plain error.  United States v. Morgan, 384 F.3d 1, 8 (1st Cir. 2004).  To establish plain error, Castellini must demonstrate "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected [his] substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings."  United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001).

Under existing pre-Blakely First Circuit precedent, the amount of laundered funds is a sentencing factor for determination by the court.  See United States v. Robinson, 241 F.3d 115, 121 (1st Cir. 2001) ("[S]entence-enhancing facts still may be found by

---

[13]The November 2004 version of § 5K2.20 makes it clear that "a fraud scheme generally would not meet [the] requirements [of § 5K2.20]"  U.S. Sentencing Guidelines Manual § 5K2.20, cmt. n.2 (2004).

the judge under a preponderance-of-the-evidence standard as long as those facts do not result in a sentence that exceeds the original statutory maximum.").  "Because the trial judge acted in accordance with circuit precedent (not yet clearly established to be erroneous), we cannot say plain error occurred, and we need not proceed further."  Morgan, 384 F.3d at 8.

## V.

Castellini's convictions and sentence are **affirmed**.