UNITED STATES of America,
Plaintiff–Appellee,

v.

Benito T. ESTACIO, Defendant–
Appellant.

No. 93–10713.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 5, 1994.

Decided Aug. 22, 1995.

As Amended on Denial of Rehearing
Oct. 31, 1995.

**478**

David Alkire, Santa Monica, CA, for defendant-appellant.

Daniel S. Linhardt, Asst. U.S. Atty., Sacramento, CA, for plaintiff-appellee.

Before: SKOPIL, SCHROEDER, and RYMER, Circuit Judges.

SCHROEDER, Circuit Judge.

Appellant Benito Estacio appeals his conviction after jury trial on a sixteen-count indictment arising out of an elaborate check kiting scheme. The counts of conviction included one count of conspiracy to commit bank fraud (18 U.S.C. § 371), one count of aiding and abetting bank fraud (18 U.S.C. § 1344), and fourteen counts of money laundering (18 U.S.C. § 1956). The sentencing guideline range as calculated in the presentence report was 121–151 months, but the district court made a downward departure to concurrent terms of 40 months on all counts. The government does not cross-appeal.

Estacio functioned as the chief financial officer of a development company that owned several car dealerships in an automotive mall. With Estacio's knowledge, and under his direction, two dealerships conducted the check kiting at issue in this case by exchanging bad checks drawn on each dealership's respective bank. The kite flew at its highest in December of 1990, when the two dealerships exchanged kited checks totaling nearly $1,000,000 daily. In January 1991, the kite crashed when one of the banks refused to honor a check; the other bank ultimately lost more than $3,000,000.

The unusual feature of this prosecution is that the charges against Estacio included money laundering in violation of 18 U.S.C. § 1956, a crime not usually associated with check kites. Estacio was charged with a separate crime of money laundering for each deposit that the dealerships made during the December, 1990 height of the kiting operation. We affirm all of the convictions for bank fraud and conspiracy to commit bank fraud. Estacio's contention that inflated credits in a bank account cannot constitute "proceeds of unlawful activity" within the meaning of the money laundering statute is without merit. We also reject Estacio's further contention that all of his convictions must be reversed because of the prosecutor's handling, before the grand jury, of the issue of immunity for other participants in the scheme who testified at Estacio's trial. Finally, Estacio's contention that the record reflects jury coercion by the trial court after it administered an *Allen* charge must also be rejected.

*Background*

In June of 1990 through January of 1991, Estacio worked as a developer and chief financial officer of Transportation Enterprise, an auto plaza service and development company headed by Thomas DePasquale. Two dealerships in the plaza, Love Chevrolet ("Love") and Sunset Oldsmobile ("Sunset"), engaged in the check kiting at issue in this case. Love had its banking account with Security Pacific Bank; Sunset banked with Wells Fargo Bank. Beginning in about June of 1990, Love's account at Security Pacific became increasingly overdrawn. At this time it became apparent to Love's manage-

ment and Estacio, who acted as an intermediary between Love's owner, DePasquale, and the manager of the Security Pacific Bank branch, that the overdrafts could not be made up.

In order to cover the checks that Love Chevrolet was writing, Love's business manager began to engage in a check swap with her counterpart at Sunset Oldsmobile. Sunset would write insufficient funds checks to Love which, when accepted for deposit, created an artificial increase in Love's balance at Security Pacific. Love, at the same time, would write checks totaling a similar amount to Sunset for deposit at Wells Fargo. The total amount of the checks to be exchanged by each dealership was termed the daily "hit." Runners from Love and Sunset met daily in a parking lot to exchange the checks and travel to their respective banks for deposit.

As the checks continued to flow between the two banks, the inflated balances in the two dealerships' accounts progressively grew. By December of that year, the dealerships exchanged close to $1,000,000 in checks each day. All of these checks were knowingly written on insufficient funds and deposited with the intent to defraud the banks. The evidence showed that Estacio directed the amount of the checks exchanged, assisted by a computer program that showed the status of the Security Pacific account on a daily basis.

While the kite was airborne, the device of exchanging checks totaling approximately matching amounts ensured that neither account became more overdrawn than the other. Until mid-January of 1991, the two banks displayed what in hindsight seems surprising tolerance for the transactions. Then, on January 8, 1991, Wells Fargo refused to honor one of Love's checks, drawn on the Security Pacific account. The check kiting scheme came crashing to the ground with the resultant multi-million dollar loss to Security Pacific. Estacio was indicted after DePasquale pled guilty. His trial proceeded on the basis of a second superseding indictment, the terms of which are important to the issues raised in this appeal.

Count One of the indictment alleged a conspiracy to commit bank fraud in violation of 18 U.S.C. §§ 371 and 1344. The government alleged that the conspiracy began about June 1, 1990 and continued through January 16, 1991. The conspiracy therefore included the entire period during which the kiting took place as well as the post-crash period in which Estacio allegedly engaged in cover-up activity.

Count Two of the indictment alleged aiding and abetting the commission of bank fraud in violation of 18 U.S.C. §§ 2 and 1344. That count related only to the period from about January 2, 1991 through January 16, 1991, and included alleged activities designed to cover up DePasquale's and Estacio's involvement in what Security Pacific, by then, knew had been a kite.

Counts Three through Sixteen of the indictment alleged separate incidents of money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i) and aiding and abetting money laundering in violation of 18 U.S.C. § 2. In relevant part, the indictment on these counts alleged as follows:

BENITO T. ESTACIO engaged in check kiting which involved the proceeds of a specified unlawful activity, that is, bank fraud, with intent to promote the carrying on of said specific unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transaction, that is the funds obtained from the check kite in the amounts set forth below, represented the proceeds of some form of unlawful activity.

| Count | Date | Amount of Deposited Checks | Bank in Which The Deposit Was Made |
|-------|------|---------------------------|-------------------------------------|
| 3 | 12/6/90 | $ 981,085.00 | Wells Fargo Bank |
| 4 | 12/6/90 | $ 981,085.00 | Security Pacific National |
| 5 | 12/7/90 | $ 866,425.68 | Wells Fargo Bank |
| 6 | 12/7/90 | $ 855,478.00 | Security Pacific National |
| 7 | 12/10/90 | $ 918,000.00 | Wells Fargo Bank |
| 8 | 12/10/90 | $ 928,947.68 | Security Pacific National |
| 9 | 12/11/90 | $ 686,041.00 | Wells Fargo Bank |
| 10 | 12/11/90 | $ 686,041.00 | Security Pacific National |
| 11 | 12/12/90 | $ 590,890.00 | Wells Fargo Bank |
| 12 | 12/12/90 | $ 590,890.00 | Security Pacific National |
| 13 | 12/13/90 | $1,008,454.29 | Wells Fargo Bank |
| 14 | 12/13/90 | $ 979,542.00 | Security Pacific National |
| 15 | 12/14/90 | $ 910,328.40 | Wells Fargo Bank |
| 16 | 12/14/90 | $ 906,417.72 | Security Pacific National |

Estacio first contends on appeal that the check kiting did not involve "proceeds" of unlawful activities within the meaning of the

**480**

money laundering statute because the kiting did not involve "real money."

Estacio also challenges the government's handling of witness immunity. During the course of trial, the trial court became concerned that government witnesses involved in the kite were testifying without immunity. The court learned that, prior to appearing before the grand jury, the witnesses had simply been told by the prosecution that they would not be prosecuted if they testified truthfully at Estacio's trial. The judge continued the trial for several days to clear the issue, and during that period the government granted complete immunity to all the prosecution witnesses who had been involved in the kite. When the trial resumed, the jury was made aware that the government witnesses were testifying under immunity. In this appeal, Estacio now claims that because the grand jury was not told that seven of the government's witnesses were testifying under immunity, there was prosecutorial misconduct requiring the dismissal of this indictment.

A final issue on appeal pertains to jury deliberations. After the jury had deliberated for two days, it sent a note to the court indicating that it was deadlocked. The district judge administered an *Allen* charge and sent the jury out to commence further deliberations at approximately 3:30 in the afternoon. The next day, a Friday, at approximately 2:30, the judge brought the jury members back and inquired as to their progress. Estacio contends on appeal that the colloquy that took place between the court and the jury foreman at that time was coercive in light of the jury's prompt return to render a unanimous verdict of guilty on all counts.

We address each of Estacio's contentions in turn.

### Money Laundering

■ 18 U.S.C. § 1956(a)(1), originally enacted in 1986, was described in a Senate

Committee Report as the "basic money laundering offense." Report 99433, 99th Cong.2nd Sess. 9. To prove a violation under § 1956(a)(1)(A)(i), the government must establish that the defendant (1) was involved in an actual or attempted financial transaction, (2) which the defendant then knew involved the proceeds of unlawful activity, (3) with the intent to promote specified unlawful activity. 18 U.S.C. § 1956(a)(1)(A)(i).[1] Bank fraud is a "specified unlawful activity" for purposes of § 1956. *See* 18 U.S.C. §§ 1956(c)(7)(A) & 1961(1).

■ Estacio contends that the government has not shown that he laundered the proceeds of underlying unlawful activity within the meaning of the statute. He argues that "proceeds" must always consist of money or some tangible asset. We do not agree. The statute does not define the term "proceeds." In rejecting void for vagueness challenges to the money laundering statute, however, several courts have adopted dictionary definitions that define the term broadly. *United States v. Ortiz,* 738 F.Supp. 1394, 1400 (S.D.Fla.1990); *United States v. Gleave,* 786 F.Supp. 258, 270 (W.D.N.Y.1992), *rev'd on other grounds sub nom United States v. Knoll,* 16 F.3d 1313 (2d Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 574, 130 L.Ed.2d 490 (1994). A fraudulently obtained line of credit, which results in an artificially inflated bank balance, is within the scope of the term "proceeds" as used in § 1956. When Estacio directed the deposit of checks drawn on insufficient funds, as described in Counts 3–16 of the indictment, he unquestionably knowingly promoted the commission of bank fraud as defined in 18 U.S.C. § 371 and § 1344.

Section § 1956 requires that the government additionally prove that the defendant knowingly used the proceeds of unlawful activity in a separate financial transaction. A leading decision is *United States v. Edgmon,* 952 F.2d 1206 (10th Cir.1991), *cert. de-*

---

1. Section 1956(a)(1)(A)(i) provides criminal penalties for persons who,

 (a)(1) ... knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, con-

duct[ ] or attempt[ ] to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—
 (A)(i) with the intent to promote the carrying on of specified unlawful activity[.]

*nied,* —— U.S. ——, 112 S.Ct. 3037, 120 L.Ed.2d 906 (1992), where the court said:

Congress appears to have intended the money laundering statute to be a separate crime distinct from the underlying offense that generated the money to be laundered. The senate report on § 1956 expresses the need for a federal criminal offense aimed directly at the activity of laundering the money gained from illegal activity.

*Id.* at 1213, (citing Sen.R. 99–433 at 4). *Edgmon* went on to explain that money laundering conduct must be separate from the offense giving rise to proceeds, because money laundering aims at conduct later in time than the underlying activity.

The discussion throughout the [Senate] report is of the gap in the criminal law with respect to the post-crime hiding of the illgotten gains. . . . Congress *aimed* the crime of money laundering *at conduct that follows in time the underlying crime rather than to afford an alternative means of punishing the prior "specified unlawful activity."* . . . We find that Congress intended money laundering and the "specified unlawful activity" to be separate offenses separately punishable.

*Edgmon,* 952 F.2d at 1213–14 (emphasis added).

It is not clear from the indictment that the conduct alleged to have constituted laundering—receipt and deposit of bad checks—was separate from the conduct charged as the underlying criminal bank fraud activity. Estacio never challenged the sufficiency of the indictment, however, and does not argue that these money laundering convictions must be overturned because of the government's failure in the indictment to describe separate unlawful activity that gave rise to the laundered proceeds. This is understandable, for the record is abundantly clear that the deficiency in the indictment did not prejudice Estacio.

■ The government's actual theory was that Estacio knew and participated in the bank fraud long before December, and that he actively participated in the December kites to perpetuate the earlier fraud. There was ample evidence of check kiting, or bank fraud, starting in June 1990 and continuing throughout the months preceding the December 1990 check kiting charged as money laundering. Accordingly, there existed separate underlying unlawful activity that gave rise to the proceeds charged in the indictment and Estacio suffered no prejudice as a result of any irregularities in the charging document.

The December deposits could instead have been charged as bank fraud but appellant has never contended that the money laundering statute is inapplicable to conduct that was, prior to the Act's passage, already subject to criminal penalties. *See* Jimmy Gurule, *The Money Laundering Control Act of 1986: Creating A New Federal Offense Or Merely Affording Federal Prosecutors An Alternative Means of Punishing Specified Unlawful Activity?,* 32 Am.Crim.L.Rev. 823 (1995). The district court was never given any opportunity to order the government to cure any error in the indictment. The money laundering convictions must therefore be affirmed.

### Alleged Prosecutorial Misconduct

Estacio argues that because the grand jury was not told that seven of the government's witnesses testified under what was effectively a grant of immunity, the government presented the witnesses in such a "false light" as to constitute prosecutorial misconduct requiring dismissal of the indictment as to all charges.

■ If appellant's argument is to succeed, we must be able to conclude "that the grand jury's independence was so undermined that it could not make an informed and unbiased determination of probable cause." *United States v. Sears, Roebuck & Co., Inc.,* 719 F.2d 1386, 1392 (9th Cir.1983), *cert. denied,* 465 U.S. 1079, 104 S.Ct. 1441, 79 L.Ed.2d 762 (1984). The government is under no obligation to present exculpatory evidence in a grand jury proceeding. *See United States v. Williams,* 504 U.S. 36, 50–56, 112 S.Ct. 1735, 1744–46, 118 L.Ed.2d 352 (1992). In this case, knowledge or lack of knowledge of government witness immunity could not have affected grand jury independence.

■ Estacio also contends that the witnesses' rights were violated by the prosecutor's failure to follow the provisions of the

Department of Justice Manual that require the giving of *Miranda* rights to possible prosecutorial targets. Estacio's standing to raise violations of Justice Department policy affecting the grand jury witnesses is unclear. We need not discuss the issue for we have noted that reliance on Justice Department Guidelines does not create enforceable rights. *United States v. Busher,* 817 F.2d 1409, 1411 (9th Cir.1987). Although the doubtful immunity status of the witnesses arose during the defendant's trial, the district court took prompt action to correct the situation and the petit jury convicted Estacio with full knowledge of the witnesses' immunity status. Defendant's rights were not affected.

### Juror Coercion

Estacio claims that the colloquy between the trial court and the jury foreman at approximately 2:30 on Friday afternoon, the day after an *Allen* charge was given, was impermissibly coercive. The colloquy included the following:

> The Court: Can you tell me, have you reached any verdicts at all at this point?
>
> The Foreman: No, sir. We haven't taken another verdict test at all. We are just about ready to.
>
> The Court: I'm sorry. I got you too early.
>
> The Foreman: We were getting all our stuff together.
>
> The Court: Okay. Let me ask you this: I have an appointment that I have to make at 5:00 this afternoon. So if I bring you back by four, will you have some idea where you are?
>
> The Foreman: Yes, sir.
>
> The Court: Okay. Why don't we do that, then. We'll see you at 4:00.

The jury rendered its unanimous verdict of guilty on all counts at 3:45 that day.

 In assessing the coerciveness of supplemental instructions, we look not only to the form of the jury charge, but also to the amount of time of deliberation following the charge, the total time of deliberation, and any other indicia of coerciveness or pressure. *See United States v. Cuozzo,* 962 F.2d 945, 951 (9th Cir.), *cert. denied,* ─── U.S. ───, 113 S.Ct. 475, 121 L.Ed.2d 381 (1992). Here,

the jury's one and one-quarter hour deliberation after the colloquy, considered in light of the jury foreman's statement indicating the imminence of a verdict vote at the time of the colloquy, does not give rise to any presumption of coercion. The jury's total deliberation in the case spanned nearly four days. Defense counsel's failure to object to the judge's comments at the time of the colloquy "indicates that the potential for coercion argued now was not apparent to one on the spot." *Lowenfield v. Phelps,* 484 U.S. 231, 240, 108 S.Ct. 546, 552, 98 L.Ed.2d 568 (1988). The juror affidavits on the subjective effect of the judge's statements are inadmissible. *Rinehart v. Wedge,* 943 F.2d 1158, 1160 (9th Cir. 1991) (per curiam); *see also United States v. Maree,* 934 F.2d 196, 201 (9th Cir.1991).

We conclude that the judge's comments do not suggest impermissible coercion, much less any coercion rising to the level of plain error.

AFFIRMED.