**UNITED STATES of America, Plaintiff,**

v.

**Salvador Esquino NUNEZ (1), Monica Sanchez–Navarro (2) Defendants.**

**No. 04CR0086–DMS.**

United States District Court, S.D. California.

Aug. 5, 2005.

U.S. Attorney CR, U.S. Attorneys, District of California Criminal Division, San Diego, CA, for Plaintiff.

Federal Defenders, Federal Defenders of San Diego, San Diego, CA, for Defendant.

## ORDER GRANTING–IN–PART AND DENYING–IN–PART GOVERNMENT'S MOTION TO RECONSIDER; REINSTATING COUNTS ELEVEN THROUGH THIRTEEN OF THE INDICTMENT; AND STRIKING CERTAIN ALLEGED OVERT ACTS FROM COUNT ONE

SABRAW, District Judge.

On December 10, 2004, this Court granted Defendant Salvador Esquino Nunez's motion to dismiss Counts Ten through Thirteen of the indictment (the "money laundering counts"). The Government has moved to reconsider that ruling. The Court heard argument on July 7, 2005. Attorney Timothy D. Coughlin appeared for the Government. Attorney Todd W. Burns appeared for Defendant Esquino; he also appeared specially for Defendant Monica Sanchez–Navarro. The Court commends the litigants for their excellent presentation of the legal issues. Upon careful consideration of the arguments of counsel, the relevant pleadings, and the applicable law, the Government's motion for reconsideration is GRANTED-in-part and DENIED-in-part. Counts Eleven though Thirteen of the indictment are RE-INSTATED. Count Ten, however, remains DISMISSED. In addition, overt acts "jj," "kk," and "ll" in furtherance of Count One (Conspiracy to Commit Bankruptcy Fraud), are STRICKEN from the indictment.

## I.

## BACKGROUND

Despite the indictment's numerous counts and complicated factual averments, the Government's money laundering theory is simply stated. Essentially, the Government maintains that Defendant Esquino illegally concealed his yacht from the bankruptcy court (bankruptcy fraud); he then sold the yacht, and laundered the proceeds from that sale in three subsequent transactions (money laundering).

The following is a summary of the Government's theory of the case, as stated in the indictment. Defendant Esquino petitioned for Chapter 7 Bankruptcy (liquidation) in April 1998. When he filed for bankruptcy, he had an affirmative duty to apprise the bankruptcy court of all known property. Despite this duty, Defendant Esquino did not report his 83' yacht: the *Caval D'Mar.* By omitting the yacht from the bankruptcy petition and the various related schedules of assets, Defendant Esquino concealed that property from the bankruptcy court, constituting actionable bankruptcy fraud on the date that the duty to report attached: April 24, 1998.[1] This omission was charged as Count 3 of the indictment: bankruptcy fraud through concealment of assets, in violation of 18 U.S.C. § 152(1).

---

1. In the normal course of events, the bankruptcy proceedings start with the filing of a bankruptcy petition. Then, the debtor is required to disclose his assets and creditors, etc., in various schedules (which may be filed concurrently with the petition). Subsequently, there is a Section 341(a) meeting of creditors (ordinarily, between 20 and 40 days after the filing of the petition; here, it did not occur until July 20, 1998), where the property of the estate is further defined. *See generally* 2 Epstein, Nickles & White, *Bankruptcy* § 7–2, at 281–85 (1992) (providing an overview of Chapter 7 Bankruptcy proceedings). The Government argues the duty to disclose attaches at the time the petition is filed. *See United States v. McIntosh,* 124 F.3d 1330, 1335 (10th Cir.1997). In this case, that date was April 24, 1998. (Indictment, ¶ 6.)

Next, once the yacht was "concealed," Defendant Esquino conducted a series of transactions by which he sold the yacht through Cays Yacht Sales ("Cays"). He then endorsed and deposited the proceeds from the yacht sale into a joint account (with his son) at Bank of America, referred to in the indictment as the "Coronado Account."

In August 1998, Defendant Esquino presented the yacht for inspection at the U.S. Customs Port of Entry in San Diego, listing his son as the owner. On October 14, 1998, he obtained a power of attorney from his son for all matters related to the yacht. That same day, Defendant Esquino negotiated an advance loan of $100,000 from Cays for the yacht sale. He then opened the Coronado Account, by depositing a $10,000 check issued by Cays, and made payable to his son.

On October 21, 1998, Defendant Esquino endorsed and deposited a $38,000 check into the Coronado Account, issued by Cays to his son. On November 25, 1998, he entered into a contract to sell the yacht for $650,000. On December 7, 1998, he endorsed and deposited a $5,000 check into the Coronado Account, issued by Cays to his son. On December 11, 1998, Defendant Esquino arranged for the deposit of a $35,000 check into the Coronado Account, issued by Cays to his son. Finally, on January 11, 1999, he endorsed and deposited a $365,275 check into the Coronado Account, issued by Cays to his son. In total, the yacht sale generated at least $453,275, which Defendant Esquino endorsed and deposited into the Coronado Account.[2]

Next, the Government focuses on three specific transactions, where money was moved out of the Coronado Account and transferred elsewhere. First, on January 19, 1999, Defendant Esquino directed the wire transfer of $320,000 from the Coronado Account into his account at the Casa de Cambio Interncontinental S.A.C.V., at Amtrade International Bank, in Miami, Florida ("Casa de Cambio Account"). Second, on January 25, 1999, he directed the wire transfer of $15,000 to his brother, out of the Coronado Account. Third, on February 7, 1999, he directed the wire transfer of $78,000 from the Coronado Account into his Casa de Cambio Account. These three transactions are alleged in Counts Eleven through Thirteen of the indictment as money laundering in violation of 18 U.S.C. § 1957(a). In addition, based on the entire scheme to launder the proceeds of the yacht sale (and other concealed property), the Government charged Defendant Esquino in Count Ten of the indictment with "conspiracy to commit money laundering," in violation of 18 U.S.C. §§ 1956(h) & 1957(a).

In sum, the Government contends Defendant Esquino concealed the yacht from the bankruptcy court by failing to report it on his petition and various schedules. That concealment was charged in Count Three of the indictment as bankruptcy fraud. Next, in a series of transactions, he sold the yacht and deposited the proceeds from the sale into the Coronado Account. He then conducted three specific transfers out of the Coronado Account. These three transactions are charged in Counts Eleven, Twelve, and Thirteen of the indictment as money laundering. Based on these (and other) transactions, Count Ten of the indictment charges a conspiracy to commit money laundering.

---

**2.** According to the Government, the yacht was to be sold for $650,000. Thus, it is unclear what happened to the remaining $196,725 from the yacht sale. Although the indictment clarifies that $100,000 of this amount took the form of an "advance," there is no indication what happened to the money.

## II.

### RELEVANT CRIMINAL STATUTES

At issue are two alleged crimes: (1) bankruptcy fraud through concealment of property; and (2) money laundering. These crimes are codified at 18 U.S.C. §§ 152(1) (bankruptcy fraud) & 1957(a) (money laundering).

18 U.S.C. § 152 catalogues nine separate types of bankruptcy crimes. The first of these crimes, listed in Section 152(1), concerns any person who "knowingly and fraudulently conceals from a custodian, trustee, marshal, or other officer of the court charged with the control or custody of property, or, in connection with a case under title 11 [Bankruptcy Code], from creditors or the United States Trustee, any property belonging to the estate of a debtor." 18 U.S.C. § 152(1). In other words, Section 152(1) proscribes concealment of property in a bankruptcy proceeding.

Section 1957(a) criminalizes "knowingly engag[ing] or attempt[ing] to engage in a monetary transactions in criminally derived property of a value greater than $10,000 [where the property is] derived from a specified unlawful activity . . . ." 18 U.S.C. § 1957(a). Congress specifically included bankruptcy fraud through concealment in the list of "specified unlawful activit[ies]," *i.e.*, predicate acts that may form the basis of a subsequent money laundering charge. *See* 18 U.S.C. § 1956(c)(7)(D) (defining "specified unlawful activity" to include "an offense under . . . section 152 (relating to concealment of assets; false oaths and claims; and bribery")). Section 1957 further defines "criminally derived property" as "any property constituting, or derived from, proceeds obtained from a criminal offense." 18 U.S.C. § 1957(f)(2).

## III.

### ORDER DISMISSING MONEY LAUNDERING COUNTS

On December 10, 2004, this Court dismissed the money laundering counts of the indictment. The Court found that the Government had charged acts of money laundering that were not premised on a completed predicate offense; the alleged underlying bankruptcy fraud was still ongoing at the time of the money laundering. Moreover, many of the specific transactions forming the underlying bankruptcy fraud offenses simply reappeared to form the basis of the money laundering offenses.

In the Ninth Circuit, prosecution for money laundering must involve a transaction in proceeds from a "previous and completed criminal activity." *United States v. Savage*, 67 F.3d 1435, 1441–42 (9th Cir. 1995) (emphasis added). Read narrowly, this language implies that if the underlying offense is deemed to be ongoing, the Government may not charge as "money laundering" any subsequent transactions in proceeds from that ongoing crime. Some circuits, however, have read the money laundering statutes more liberally, and require only a completed *phase* of an ongoing offense. Because the Ninth Circuit has never expressly adopted this broad interpretation of the money laundering statutes, this Court declined to do so. *See McElroy v. United States*, 455 U.S. 642, 658, 102 S.Ct. 1332, 71 L.Ed.2d 522 (1982) ("ambiguity concerning the reach of a criminal statute should be resolved by reading the statute narrowly in order to encourage Congress to speak clearly, thus giving the populace 'fair warning' of the line between criminal and lawful activity, and in order to have the Legislature, not the courts, define criminal activity.").

Based on the Ninth Circuit's requirement of a "completed" criminal activity,

both parties focused on when the underlying bankruptcy fraud in this case could be deemed "complete." (*See* Defendant's Response dated Dec. 2, 2004 [Doc. 71], at 3 ("the central inquiry in a money laundering charge is determining when the predicate crime became a completed offense") (citation omitted); Gov't's Supplemental Briefing dated Nov. 16, 2004 [Doc. 68], at 9 ("In the present case there is no dispute that the first phase of the bankruptcy fraud was complete when Esquino filed his fraudulent bankruptcy petition.").) Defendant Esquino argued the bankruptcy fraud was still on-going at the time of the alleged money laundering transactions. On the other hand, the Government's position was (and still is) that the crime of concealment was "complete" when Defendant Esquino filed his bankruptcy petition in August 1998. (*See* Mot. for Reconsideration at 9 ("[W]hen Esquino filed his bankruptcy petition he had an absolute duty to report all of his assets in his petition; his failure to do so, his concealment of assets, constitutes a violation of § 152 . . . .")). Accordingly, the Court sought to determine when the underlying crime of concealment could be deemed "complete."

Black's Law Dictionary defines "concealment" as: "The act of refraining from disclosure, especially an act by which one prevents or hinders the discovery of something; a cover-up. The act of removing from sight or notice; hiding." Black's Law Dictionary (8th ed.2004). Some courts use the definition of "conceal" from the 1898 Bankruptcy Act: to "secrete, falsify, and mutilate." 1 Sommer & King, *Collier Bankruptcy Manual* ¶ 7.02[1][a][i], at 7–5 (3d ed. rev.2004) (citing *US v. Montilla Ambrosiani*, 610 F.2d 65 (1st Cir. 1979)). In other words, concealment may be accomplished through an affirmative act or series of acts, or merely through an omission when a duty to act exists. The term "concealment" refers, therefore, to a process of preventing disclosure of certain property belonging to the estate of a debtor.

Because bankruptcy fraud through concealment is, by its very nature, an ongoing offense, the Court disagreed with the Government's argument that the concealment was "compete" upon filing the bankruptcy petition: quite simply, the filing of a bankruptcy petition is not an element of Section 152(1).[3] Of course, when Defendant Esquino made out his petition and schedules of assets, he did so "under penalty of perjury." But Defendant Esquino was not charged with *perjury;* he was charged with *concealment* of property.[4] *See United States v. Shapiro*, 101 F.2d 375, 378–79 (7th Cir.1939) ("Omission of any assets from the schedule indicates concealment, but this taken alone is not conclusive. The conduct of the bankrupt, the relative extent of the omission, the character of the asset itself, and the reasons given for the

**3.** "[T]he offense is not making a misrepresentation at a given time and place; it is the continuous concealment of the property from the trustee during the whole course of the bankruptcy proceedings or beyond. The omission from the schedule would amount to nothing if the bankrupt had disclosed the property to the trustee. To prove this continued concealment, it is not necessary, of course, to take up each moment of the bankrupt's life while the proceedings lasted, and to prove what he did as a means of proving what he did not. *The moment of filing the schedules is no more important than any other mo-* ment, and although the fact of misrepresentation in them would corroborate testimony that certain property was not disclosed, it is like any other corroborative evidence and is not necessary in order to make out an offense." *Johnson v. United States,* 163 F. 30, 33 (1st Cir.1908) (Holmes, Circuit Justice) (emphasis added).

**4.** Note that Section 152(2), which was not charged here, relates to "false oaths in relation to a bankruptcy case." 18 U.S.C. § 152(2).

difference between the financial statements of the business and the bankruptcy schedules are the other circumstances in every case. If these circumstances explain the omission, there is no concealment.").

The debtor has a continuing duty to correct or amend his initial petition throughout the bankruptcy proceedings. *See* 4 Resnick & Sommer, *Collier on Bankruptcy* ¶ 521.07, at 521–27 (15th ed. rev.2005) ("The duty to disclose is a continuing one. If, during the case, the debtor or counsel for the debtor discovers assets or claims that have not been scheduled, the schedules should be amended. It is often necessary to amend a schedule or schedules. Under Federal Rule of Bankruptcy Procedure 1009, a voluntary petition, list, schedule or statement may be amended as a matter of course any time before the closing of the case."). *See also Hamilton v. State Farm Fire & Cas. Co.,* 270 F.3d 778, 785 (9th Cir.2001) ("The debtor's duty to disclose potential claims as assets does not end when the debtor files schedules, but instead continues for the duration of the bankruptcy proceeding."). To this end, Congress clarified in 18 U.S.C. § 3284 that concealment of assets is deemed to be a continuing offense, for statute of limitations purposes, until the time of discharge. This rule makes sense: until the time of discharge, the debtor may correct his earlier mistaken omission through an amended petition or amended schedule. *See* Fed. R. Bank. P. 1009.[5]

Based on the ongoing nature of concealment in a bankruptcy case, the Court found that the criminal act of concealment could not be deemed complete, for money laundering purposes, until the time of discharge. In other words, the Government may not charge as money laundering any transactions in the proceeds of an alleged concealment crime, so long as that concealment was still occurring at the time of the alleged laundering.

Here, Defendant Esquino's concealment in the underlying bankruptcy case did not end until May 21, 1999, with the discharge of his bankruptcy petition. Because the three charged acts of money laundering occurred *before* the discharge (between January 19, 1999, and February 7, 1999), while the bankruptcy fraud still was occurring, the Court found that the money laundering counts were not based on the "previous and completed" predicate offense of bankruptcy fraud. In addition, many of the "overt acts" charged in furtherance of the conspiracy to commit bankruptcy fraud were simply re-alleged as "overt acts" in furtherance of the conspiracy to commit money laundering. Consequently, the Court granted Defendant Esquino's motion to dismiss the money laundering counts.

The Government moved to reconsider that ruling on January 10, 2005. At a hearing on June 9, 2005, the Court requested Defendant Esquino's response to the Government's motion. Defendant Esquino responded on June 22, 2005. The Government submitted supplemental briefing on June 30, 2005. The Court heard argument on July 7, 2005.

## IV.

## JURISDICTION AND LAW OF THE CASE

As a preliminary matter, Defendant Esquino raises two procedural hurdles to reconsideration: (1) lack of jurisdiction; and

---

**5.** Under Rule 1009, a debtor's request to amend the petition may not be denied unless a creditor demonstrates the debtor's bad faith or prejudice to creditors. *See In re Michael,* 163 F.3d 526, 529 (9th Cir.1998) (citation omitted); *In re Sandoval,* 103 F.3d 20, 22 (5th Cir.1997) (citation omitted).

(2) law of the case doctrine. Neither of these issues, however, precludes reconsideration of the Court's earlier ruling.

■ First, as to jurisdiction, Defendant Esquino argues the Government's motion to reconsider was not timely filed within the period prescribed for appeal. Thus, the Court no longer has jurisdiction over the dismissed counts of the indictment. He relies on *United States v. Rubio*, 727 F.2d 786, 798 (9th Cir.1983) (citing *United States v. Emens*, 565 F.2d 1142, 1144–45 (9th Cir.1977)), which states that an inadvertently dismissed indictment may be reinstated by the trial court, post trial, during the time prescribed for appeal.

Here, as acknowledged by Defendant Esquino, the circumstances are somewhat different because the Court dismissed the portions of the indictment *before* trial. In *United States v. Jones*, 608 F.2d 386, 390 (9th Cir.1979), the Ninth Circuit examined the government's motion for reconsideration of the district court's interlocutory order suppressing certain evidence. The court noted that: "No specific rule governs the timeliness of a motion for reconsideration or the effect which such a motion has on the finality of the trial court's order. The Supreme Court, however, has held that a motion for reconsideration is timely at least 'when filed within the original period for review.'" *Id.* (citing *United States v. Healy*, 376 U.S. 75, 77–78, 84 S.Ct. 553, 11 L.Ed.2d 527 (1964)). Accordingly, under 18 U.S.C. § 3731, the United States has thirty days to appeal the district court's decision to dismiss an indictment as to one or more counts. Thus, the Government had at least thirty days in which to file a motion for reconsideration.

The Court entered its Order dismissing the money laundering counts on December 10, 2004. According to Defendant Esquino, the Government had until January 10, 2005, to file its motion for reconsideration. The Government submitted its motion for reconsideration to the Clerk's office on January 10, 2005. However, because the Government failed to include the "time and date on [the] motion," the Clerk's office did not file the motion on January 10, 2005. Instead, it sent the motion to chambers with a "notice of document discrepancies," indicating that the Government failed to comply with the Local Rules that require all motions to list a hearing date and time. The next day, January 11, 2005, the Court ordered that the motion be filed *nunc pro tunc* to the date received: January 10, 2005. *See* Black's Law Dictionary (8th ed.2004) (defining "nunc pro tunc" as: "Having retroactive legal effect through a court's inherent power.").

Consequently, the Government's motion for reconsideration was timely filed. Despite Defendant Esquino's insistence (Response at 4), the Ninth Circuit's decision in *United States v. Sumner*, 226 F.3d 1005 (9th Cir.2000) does not compel a different conclusion. *See id.* at 1009–10 ("*Nunc pro tunc* amendments are permitted primarily so that error in the record may be corrected.... It does not imply the ability to alter the substance of that which actually transpired or to backdate events to serve some other purpose."). By ordering the Government's motion deemed filed as of January 10, 2005, the Court did not "resurrect its lost jurisdiction" (Response at 4); nor did the Court in any way alter the substance of what actually transpired. Rather, the Court merely ensured the accuracy of the record, in that the docket must reflect the actual date the Government submitted its motion to the Clerk's office for filing. But for an inadvertent oversight (failure to include a time and date on the motion), the Government's motion would have been filed by the Clerk's office upon submission, on January 10, 2005. Therefore, the Government's motion for reconsideration was timely filed, and

this Court retains jurisdiction over the dismissed money laundering counts.

■ Second, Defendant Esquino argues that the "law of the case" doctrine forbids reexamination of this issue. Under the law of the case doctrine, "a court is generally precluded from reconsidering an issue that has already been decided by the same court, or a higher court in the identical case." *United States v. Cuddy*, 147 F.3d 1111, 1114 (9th Cir.1998) (citation omitted). However, the law of the case "doctrine is 'discretionary, not mandatory' and is in no way 'a limit on the court's power.'" *City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper*, 254 F.3d 882, 888 (9th Cir.2001) (citation omitted).

■ To this end, a court has discretion to depart from the law of the case doctrine if: (1) the first decision was clearly erroneous; (2) an intervening change in the law has occurred; (3) the evidence on remand is substantially different; (4) other changed circumstances exist; or (5) a manifest injustice would otherwise result. *See Cuddy*, 147 F.3d at 1114 (citation omitted). As discussed below, there has been an intervening decision from the First Circuit Court of Appeals that clarifies when bankruptcy fraud begins to generate "proceeds" for the purposes of money laundering. *See United States v. Castellini*, 392 F.3d 35 (1st Cir.2004). Based in part on this new persuasive authority, it is apparent that a failure to reconsider the Court's earlier ruling would result in a manifest injustice. Thus, the law of the case doctrine does not preclude reexamination of the Court's Order dismissing the money laundering counts.

## V.

### DISCUSSION

The Court begins with what is undisputed: the omission of a yacht from a bankruptcy petition may, as a general matter, be charged as bankruptcy fraud through concealment in violation of 18 U.S.C. § 152(1). Where "an independent duty to disclose is present, inaction may be a violation as well; one may not intentionally and fraudulently fail to disclose that which the law requires." *Collier on Bankruptcy, supra,* ¶ 7.02[1][a][i], at 7–5 (citing *Edwards v. United States,* 265 F.2d 302, 306 (9th Cir.1959)). For purposes of Section 152(1), it may be sufficient for liability if one withholds knowledge of assets about which the trustee should be told. *See United States v. Weinstein,* 834 F.2d 1454, 1462 (9th Cir.1987). The bankruptcy code requires a debtor to provide exhaustive listings of tangible and intangible assets. *United States v. White,* 879 F.2d 1509, 1512 (7th Cir.1989). If the debtor fails to follow these rules, and he fraudulently omits an asset or transaction, he becomes liable for concealment in violation of Section 152(1).

In this case, it is therefore clear that, as alleged in the indictment, Defendant Esquino may be charged with bankruptcy fraud for failing to report the yacht in his petition. The issue, then, is whether that bankruptcy fraud may be used as a predicate offense for the subsequent money laundering counts.

■ As discussed above, the relevant money laundering statute criminalizes "monetary transaction[s] in criminally derived property." 18 U.S.C. § 1957(a). The statute defines "criminally derived property" as "any property constituting, or derived from, proceeds obtained from a criminal offense." 18 U.S.C. § 1957(f)(2). Consequently, the question raised here is deceptively simple: when did the underlying criminal offense begin to generate "proceeds"? Specifically, must the crime of concealment (of the yacht) be deemed "complete" before it may generate "proceeds" that can then be laundered? Upon

further examination of this issue, the answer is "no."

The Ninth Circuit has said that "proceeds" must be from a "previous and completed criminal activity." *See Savage,* 67 F.3d at 1441–42; *U.S. v. Estacio,* 64 F.3d 477, 480–81 (9th Cir.1995). The First, Second, Third, Fourth, and Seventh Circuits have applied broader language, to include "an already completed offense, *or completed phase of an ongoing offense." See United States v. Richard,* 234 F.3d 763, 770 (1st Cir.2000); *U.S. v. McCarthy,* 271 F.3d 387, 394–95 (2d Cir.2001); *United States v. Morelli,* 169 F.3d 798, 805–09 (3d Cir.1999); *United States v. Bollin,* 264 F.3d 391 (4th Cir.2001); *United States v. Mankarious,* 151 F.3d 694, 705–06 (7th Cir.1998) ("A mail fraud scheme . . . may begin to generate proceeds long before the mailing ever takes place.").

In the Order dismissing the money laundering counts, the Court observed that the Ninth Circuit had never expressly adopted the broader reading of the money laundering statutes. The Court also noted that the Fourth Circuit's *Butler* case was the only cited case to consider the specific "prior criminal activity" of Section 152 bankruptcy fraud through concealment of property. *See United States v. Butler,* 211 F.3d 826, 829 (4th Cir.2000), *cert. denied,* 531 U.S. 1149, 121 S.Ct. 1091, 148 L.Ed.2d 965 (2001). In *Butler,* a defendant who had concealed settlement proceeds from the bankruptcy court, and then used a portion of those proceeds to purchase five cashiers checks, was convicted of both bankruptcy fraud and money laundering. The court ruled that money laundering may involve proceeds derived from "a competed phase of an ongoing offense," and that "at the time Butler ordered the purchase of each of the five cashier's checks, he had completed a phase of the bankruptcy fraud." *Id.* at 829–30.

Nonetheless, this Court found *Butler* distinguishable from the circumstances of this case—unlike the indictment at issue here, the underlying act of concealment in *Butler* was readily discernible from the five subsequent acts of laundering. In addition, *Butler* was not particularly persuasive because the court seized upon the "completed *phase* of an ongoing offense" language in cursory fashion, without discussing the potential expansion of the money laundering statutes, and without acknowledging the ongoing nature of concealment in a bankruptcy case.

Five days after the Court issued its Order, however, the First Circuit decided *Castellini,* 392 F.3d at 35. Like *Butler, Castellini* also deals with the underlying violation at issue here: bankruptcy fraud through concealment of assets in violation of Section 152. The defendant in *Castellini* was convicted of laundering the proceeds of a fictional bankruptcy fraud; he was the subject of a government "sting" operation. *Castellini,* 392 F.3d at 37–38. The undercover agent told Castellini that he was going to be involved in an impending bankruptcy proceeding, and that he desired to conceal $300,000 from the bankruptcy court by transferring it to Castellini's management company, and then into an offshore trust. *Id.* at 40–41. Eventually, the agent gave Castellini a $30,000 check, which Castellini deposited into his account. Castellini then moved the money through various offshore accounts. *Id.* at 42. A few months later, the agent gave Castellini another $30,000 check, which "went on the same world-wide tour as the first $30,000." *Id.* at 43.

Castellini argued on appeal that the monetary transactions could be charged only as aiding and abetting the underlying bankruptcy fraud, not as money laundering. *Id.* at 47. Like Defendant Esquino in the present case, Castellini relied on

"the concept of non-simultaneity." *Id.* Essentially, he argued that the agent's delivery of the two $30,000 checks *initiated* the money laundering, and that those same acts cannot have simultaneously *completed* the underlying bankruptcy fraud necessary for the money laundering to have occurred. *Id.* In other words, when Castellini accepted the checks, he started the money laundering scheme. By that same transaction, however, he also completed the bankruptcy fraud scheme. Consequently, Castellini argued the alleged money laundering could not have been based on the "previous and completed criminal activity" of bankruptcy fraud. *Id.*

In affirming the convictions, the *Castellini* court noted that "proceeds" of an illegal activity *"may be created before the completion of an underlying on-going crime." Id.* at 48 (citation omitted) (emphasis added). The court explained why, under those circumstances, the government could charge Castellini with *both* bankruptcy fraud *and* money laundering: " 'proceeds' of bankruptcy fraud were created as of the time Castellini accepted the checks from the agent in order to hide them from the bankruptcy court.... [T]he first of multiple efforts to hide a series of assets from the bankruptcy court may create proceeds of illegal activity." *Id.* The court also clarified that once Castellini accepted the checks, the government could have charged the "world-wide tour" of subsequent offshore transfers as *either* money laundering *or* aiding and abetting of bankruptcy fraud. *Id.* ("From that point of view, the fact that Castellini's additional actions after initially receiving the funds (moving the funds around, and so forth) could have been charged as either money laundering or aiding and abetting an ongoing bankruptcy fraud could be thought to be irrelevant.").

■ Reading *Butler* and *Castellini* together, it becomes clear that the money laundering statutes must be construed broadly to encompass transactions in proceeds derived from separate, completed acts in an on-going criminal scheme. Money laundering requires only that the underlying offense generate proceeds through transactions discrete from, and occurring prior to, the subsequent acts of laundering; the law does not require that the entire underlying offense be completed before its proceeds may be laundered. There are several reasons why this is the correct reading of Section 1957.

First, a plain reading of Section 1957 refers only to transactions in "proceeds obtained from a criminal offense." 18 U.S.C. § 1957(f)(2). The statute does not specify whether the entire "criminal offense" must have run its course before it may generate "proceeds," or, rather, whether the "proceeds" need only have come from an identifiable and completed "phase" of an ongoing criminal offense. Why, then, should courts focus on the whether the predicate crime is "complete"? Common sense dictates that an ongoing criminal offense (such as concealment in a bankruptcy case) may begin to generate proceeds long before the entire scheme has run its course. Viewed in this light, a literal reading of the statute must look exclusively at when the underlying criminal offense begins to generate "proceeds"; the question of when the entire underlying crime is "complete" may be immaterial.

Second, the Court must consider Congress's purpose in enacting the money laundering statutes. These statutes target the conversion of funds derived from illegal activities into a "clean" or usable form. *See* Christopher Boran, *Money Laundering*, 40 Am.Crim. L.Rev. 847, 848 (Spring 2003). The narrower reading of the money laundering statutes frustrates this purpose, because it may insulate many transactions that are used to launder proceeds

from a bankruptcy fraud—transactions that Congress expressly included within the reach of the money laundering statutes. *See* 18 U.S.C. § 1956(c)(7)(D) (defining "specified unlawful activity" to include "an offense under ... section 152 (relating to concealment of assets; false oaths and claims; and bribery")).

For certain types of crimes, it is easy to determine when the underlying criminal activity begins to generate "proceeds, which may then be used in a money laundering transaction." For example, "Bank fraud does not generate its proceeds until after its execution. Wire fraud often does not give rise to proceeds until after a wire transfer." *Mankarious,* 151 F.3d at 705. It may even be said that certain acts of bankruptcy fraud—*e.g.,* filing a fraudulent petition in violation of 18 U.S.C. § 157(1)— may begin to generate "proceeds" immediately after the filing of the fraudulent petition. *See United States v. DeSantis,* 237 F.3d 607, 613 (6th Cir.2001).

Conceptually, however, concealment of assets seems different because of its continuing nature. *See Sultan v. United States,* 249 F.2d 385, 386 (5th Cir.1957) (recognizing the "obvious fact that concealment by its nature is an act that goes on until detected or its consequences are purged."). Nonetheless, the failure to disclose an asset may be charged as concealment under Section 152(1) on the day that the duty to report attaches.[6] *See United States v. Wagner,* 382 F.3d 598, 606–10 (6th Cir.2004) (providing an exhaustive discussion of the scope of the term "conceal" in Section 152(1)). *See generally Collier Bankruptcy Manual, supra,* at ¶ 7.02[1][a][i]. The offense of concealment, although not technically a "completed crime" until after discharge of the bankruptcy petition, may nonetheless generate proceeds immediately following that initial concealment (or non-disclosure).

In many cases, the "proceeds" from a bankruptcy fraud already would have been laundered *before* the discharge of the bankruptcy case, through a series of transactions increasingly remote from the initial act (or omission) of concealment. In such cases, there would be no need for subsequent laundering transactions *after* the discharge, because the money would already have been "clean." Thus, the narrower reading of the money laundering statutes immunizes those transactions (post-concealment, pre-discharge) from being charged as money laundering. On the other hand, the broader reading permits such transactions to be charged as money laundering; it precludes the conversion of those funds that already have been tainted with illegality. Stated differently, the narrower reading of the money laundering statutes would countenance criminals who launder the proceeds of a bankruptcy fraud, as long as the laundering was completed before the time of discharge. This could not have been the result intended by Congress.

Third, in the Order dismissing the money laundering counts, the Court placed significant emphasis on 18 U.S.C. § 3284, which provides that concealment crimes are deemed ongoing offenses—for statute of limitations purposes—until the time of discharge. The Government expressly relied on the ongoing nature of the bankruptcy fraud to defeat Defendants' argument that the acts of bankruptcy fraud occurred outside the window of the appli-

6. The Government argues the duty to disclose attaches at the time the petition was filed: April 24, 1998. It should be noted, however, that even if the duty to report attached some time later (say, at the Section 341(a) meeting of creditors in July 1998), the alleged act of concealing the yacht would still have occurred several months before the alleged acts of laundering.

cable five-year statute of limitations. Consequently, the Court reasoned that the Government should accept the corresponding burden of Section 3284: bankruptcy fraud is an ongoing crime that may not serve as a predicate act in a money laundering scheme until the offense is deemed complete; the offense is not deemed complete until after discharge.

Upon further consideration, however, it is unlikely that Congress intended Section 3284 to have this substantive effect. Ninth Circuit authority counsels against such a reading of the statute in this context:

> It is manifest that [§ 3284 was] enacted for the specific purpose of fixing a definite time for the embarkation of the statutory period. The language of the limitations statute ... must be read in the light of the limitations problem with which the Congress was faced. The Congress, in using this language, was concerned only with the statute of limitations. Clearly, by the enactment and amendments of § 3284, it had no intention of modifying or limiting the provisions of § 152 ....

*United States v. Kaldenberg*, 429 F.2d 161, 163–64 (9th Cir.1970).

Finally, and perhaps most important, Ninth Circuit caselaw does not necessarily support the consequential distinction that had been relied upon in the Court's previous Order—between completed *crimes* and completed *phases* of ongoing crimes. In other words, when the Ninth Circuit used the language "previous and completed criminal activity," the court did not likely mean that only completed *crimes* would support a subsequent money laundering charge. Completed "criminal activity" is not necessarily limited to a completed crime; completed phases of an ongoing offense may also be viewed logically as completed "criminal activity." Plainly stated, the Ninth Circuit did not likely intend the "prior and completed criminal activity" language to preclude liability for the laundering of proceeds related to a completed *phase* of an ongoing criminal offense.

As to this issue, Defendant Esquino describes two mutually-exclusive "tests" that have been applied by the various federal circuits: (1) the "timing test," used in the Ninth, Tenth, and Eleventh Circuits; and (2) the "discrete acts test," used in the Second, Third, Fourth, and Seventh Circuits. (Defendant's Response at 6–7.) In *Savage*, the Ninth Circuit used the language: "conduct occurring after completion of the underlying offense." *Savage*, 67 F.3d at 1441 (citing *United States v. Edgmon*, 952 F.2d 1206, 1213–14 (10th Cir. 1991)). Similarly, in *Estacio*, the court included the language: "conduct that follows in time the underlying crime ...." *Estacio*, 64 F.3d at 480–81 (quoting *Edgmon*, 952 F.2d at 1213–14). *See also United States v. Christo*, 129 F.3d 578, 579–80 (11th Cir.1997) ("The main issue in a money laundering case, therefore, is determining when the predicate crime becomes a 'completed offense' after which money laundering can occur."). Such language suggests that the Ninth Circuit, along with the Tenth and Eleventh Circuits, focus on the "timing" of events, *i.e.*, when the underlying crime is complete. *See United States v. Kennedy*, 64 F.3d 1465, 1477–78 (10th Cir.1995) ("the central inquiry in a money laundering charge is when the predicate crime became a 'completed' offense ....").

Other courts, according to Defendant Esquino, apply the "discrete acts test." Here, the focus is on whether the underlying crime generates proceeds through acts that are discrete from the charged acts of money laundering. *See e.g., Richard*, 234 F.3d at 769–70; *United States v. Szur*, 289 F.3d 200, 214 (2d Cir.2002) ("In determining whether the underlying crime, or a

discrete phase of that crime, has been completed so as to generate 'proceeds,' the central inquiry is one of distinctiveness, not timing.") (citing *Mankarious,* 151 F.3d at 694).

The Court must therefore determine whether the "timing test" and the "discrete acts test" may coexist. To put it another way, are there really two separate tests employed by the various circuits? Or, instead, are these tests simply two alternate ways of announcing the same inquiry?

To the extent the Ninth Circuit in *Savage* and *Estacio* implicitly set forth a "timing test," the court relied in both cases on the Tenth Circuit's *Edgmon* opinion. Thus, to resolve the confusion, it is fitting to look at how the Tenth Circuit characterized *Edgmon's* emphasis on "timing" in a subsequent decision. In *United States v. Pretty,* 98 F.3d 1213 (10th Cir.1996), the Tenth Circuit explained:

The language "follows in time" does not bear the weight that [defendant] places upon it. In *Edgmon,* ... we found that because Congress intended to make a new, separately punishable offense, the conviction did not pose a double jeopardy problem. Our "follows in time" comment was intended to express merely *the separateness* of money laundering and the underlying crime for double jeopardy purposes, *not a strict temporal relationship....* [¶] We do not read our cases as holding that laundering can occur only after the underlying crime is complete.... The legislative history does not suggest even obliquely that a certain temporal relationship must exist between the underlying crime and the money laundering. Rather, it stresses the wide scope of money laundering and notes the complexity of schemes in which criminals "disguise the illegal nature and true sources of their income."

*Pretty,* 98 F.3d at 1220 (emphasis added) (internal citations omitted). *See also United States v. Dimeck,* 24 F.3d 1239, 1246 n. 12 (10th Cir.1994) ("We could envision scenarios where the money laundering and the underlying illegal activity occur simultaneously.").

Thus, the "timing" language is really just another way of saying the money laundering transactions must be separate from the underlying criminal act that generated the proceeds. The Seventh Circuit's opinion in *Mankarious* illuminates this point: "When the [Eleventh Circuit in *Christo,* 129 F.3d at 578] used the language of time, ... it was really just worried about the definition of proceeds.... Thus, time is important, but in a different way than [defendants] allege. A money launderer must obtain proceeds *before* laundering can take place." *Mankarious,* 151 F.3d at 704 (emphasis in original).

Accordingly, although some cases refer to "timing," and others refer to "discrete acts," neither test by itself resolves the dilemma. Rather, the proper analysis must involve both of these considerations: courts must determine whether the underlying crime produced "proceeds" in transactions that were *discrete from,* and occurred *prior to,* the charged acts of laundering. As explained by the First Circuit in *Castellini:* "The strict emphasis on time should not obscure the real principle of these cases. It is not a requirement that the underlying crime must be fully completed before any money laundering can begin." *Castellini,* 392 F.3d at 48. The court elucidated further the legal principle " 'that the predicate offense must begin to generate proceeds before anyone can launder those proceeds,' but [the law] does not require the two crimes involved to be entirely separate in time." *Id.* Accordingly, it is clear that " '[p]roceeds' of an illegal activity may be created

*before the completion* of an underlying on-going crime." *Id.* (emphasis added).

Here, the Government's substantive money laundering allegations comply with this legal standard: the concealment of the yacht was the bankruptcy fraud; the sale of the yacht generated proceeds from that bankruptcy fraud; and the subsequent wire transfers were transactions in those proceeds, *i.e.*, money laundering transactions. Simply put, the concealment of the yacht generated proceeds on the date that the duty to report attached, long before the bankruptcy fraud was technically deemed "complete." Defendants then committed a series of separate transactions to launder those proceeds. *See Mankarious,* 151 F.3d at 705 ("A mail fraud scheme ... can create proceeds long before the mailing ever takes place. [Defendants] are asking us to suspend the operation of the money laundering laws between the time a fraud scheme obtains proceeds and the time that the scheme employs the mails. None of the cases cited justifies such an incredible result.").

██  In sum, to charge money laundering, the Government must allege that a defendant conducted transactions in proceeds from a prior, completed criminal activity. The prior criminal activity could include completed phases of an ongoing crime, if those phases had generated proceeds that could then be laundered in subsequent transactions. The focus should not be on whether the entire underlying criminal offense has run its course. Rather, the critical inquiry must be whether the underlying criminal offense had already generated proceeds in a completed transaction, discrete from and prior to the money laundering transactions. An ongoing

criminal offense (like bankruptcy fraud through concealment) may generate proceeds long before it is technically deemed "complete."

According to the Government, the bankruptcy fraud in this case occurred, and then began to generate proceeds, on the date Defendant Esquino had a duty to disclose the yacht to the bankruptcy court (April 24, 1998). He failed to disclose the yacht as his property, which was in itself a violation of 18 U.S.C. § 152(1). The three subsequent transactions in the proceeds from the yacht sale (three wire transfers in January and February of 1999) could then be properly charged as "monetary transactions in criminally derived property" under 18 U.S.C. § 1957(a).[7] Accordingly, the Court REINSTATES the substantive money laundering counts (Counts Eleven, Twelve, and Thirteen of the indictment).

██  As to Count Ten (money laundering conspiracy), however, the underlying concern expressed in the Court's previous Order remains valid: "At the very least, any specific transaction charged in a 'concealment' or 'conspiracy to commit bankruptcy fraud' Count, cannot later reappear to form the basis of a related 'money laundering' Count." (Order at 4.) In the indictment, the Government alleged certain "overt acts" in furtherance of the Count One conspiracy to commit bankruptcy fraud, and then re-pleaded those same transactions as "overt acts" in furtherance of the Count Ten conspiracy to commit money laundering. Whether analyzed in terms of "timing" or in terms of "discrete acts," the allegations of Count Ten run afoul of the relevant legal principle behind

---

**7.** Notably, the Government *could* have charged as money laundering the transactions by which Defendant Esquino allegedly deposited the proceeds from the yacht sale *into* the Coronado Account. In that sense, the charged transactions, where the money was transferred *out of* the Coronado Account, are an additional step removed from the underlying concealment.

the money laundering statute. The underlying crime must generate proceeds *before* those proceeds may be laundered; the acts that form the basis of the bankruptcy fraud conspiracy must be *discrete* from the acts forming the basis of the money laundering conspiracy. In either case, as explained in the Court's previous Order, the Government has charged certain transactions as *both* bankruptcy fraud and money laundering. Count Ten therefore remains DISMISSED.

Finally, as to Count One (Conspiracy to Commit Bankruptcy Fraud), overt acts "jj," "kk," and "ll" are the same three transactions that later reappear as the substantive money laundering counts: (1) the $320,000 wire transfer to the Casa de Cambio Account on January 19, 1999; (2) the $15,000 wire transfer to Defendant Esquino's brother on January 25, 1999; and (3) the $78,000 wire transfer to the Casa de Cambio Account on February 7, 1999. The Court has discussed previously why specific transactions alleged as overt acts in furtherance of a conspiracy to commit bankruptcy fraud, cannot later form the basis of a substantive money laundering transaction. An act that allegedly produces "proceeds" from a bankruptcy fraud must be distinct from, and occur prior to, the subsequent alleged act by which those proceeds are alleged to have been laundered. *See Castellini*, 392 F.3d at 48. Thus, the Court orders that overt acts "jj," "kk," and "ll" in furtherance of the Count One conspiracy to commit bankruptcy fraud, be STRICKEN from the indictment.

## VI.

### CONCLUSION AND ORDER

When a monetary transaction is charged as money laundering under 18 U.S.C. § 1957(a), the transaction must involve proceeds from a specified unlawful activity. Here, the specified unlawful activity was bankruptcy fraud through concealment of an asset (a yacht), in violation of 18 U.S.C. § 152(1). That underlying bankruptcy fraud began to generate proceeds on the date that the duty to report the yacht attached: April 24, 1998. At that point, the proceeds of the bankruptcy fraud could then be laundered in subsequent transactions. Accordingly, when Defendant Esquino deposited the proceeds from the sale of the yacht into the Coronado Account, and then transferred money out of the account in three specific transactions, those three transactions were properly charged as money laundering in Counts Eleven through Thirteen of the indictment.

For these reasons, the Court hereby **GRANTS-in-part** and **DENIES-in-part** the Government's motion to reconsider the Order dismissing the money laundering counts [Doc. 81–1, 128–1], and **REINSTATES** Counts Eleven through Thirteen of the indictment (the substantive money laundering counts). In Count Ten (Conspiracy to Commit Money Laundering), however, the Government simply re-alleges as "overt acts" the same transactions that form the "overt acts" of Count One (Conspiracy to Commit Bankruptcy Fraud). Consequently, Count Ten remains **DISMISSED**. Finally, because overt acts "jj," "kk," and "ll" in furtherance of Count One are the same three transactions later charged in Counts Eleven through Thirteen as the substantive money laundering counts, overt acts "jj," "kk," and "ll" are **STRICKEN** from Count One of the indictment.

**IT IS SO ORDERED.**