# United States Court of Appeals
## For the First Circuit

No. 24-2044

UNITED STATES OF AMERICA,

Appellee,

v.

JEROMY PITTMANN,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Landya B. McCafferty, U.S. District Judge]

Before

Gelpí, Thompson, and Kayatta,
Circuit Judges.

        Bradley L. Henry, with whom Amanda Firgau, Paul H. Tzur, and
Blank Rome LLP were on brief, for appellant.
        David M. Lieberman, Attorney, Appellate Section, U.S.
Department of Justice, with whom Jeremy R. Sanders, Assistant
Chief, Fraud Section, Criminal Division, Matt Kahn, Trial
Attorney, Fraud Section, Criminal Division, Theodore M. Kneller,
Trial Attorney, Fraud Section, Criminal Division, and Matthew R.
Galeotti, Supervisory Official, Criminal Division, were on brief,
for appellee.

October 22, 2025

**KAYATTA**, **Circuit Judge**.  A jury convicted Jeromy Pittmann of multiple crimes related to his participation in a scheme to provide, in exchange for money, letters of recommendation for Afghans seeking visas to enter the United States.  On appeal, Pittmann challenges all four counts of conviction.  We now affirm on all counts.  Our reasoning follows.

## I.

## A.

In 2003, Pittmann was sworn in as a U.S. Navy Reserve officer.  Over the next decade and a half, he served several deployments in Iraq and Afghanistan.  During his deployments in Afghanistan, he frequently relied on Afghan interpreters to communicate with members of the Afghan Army.  Many of these interpreters were contractors provided to the U.S. armed forces by an Afghan company called Sunny Universe, which was owned and operated by Afghan businessman Ghulam Rabani.

After concluding his last deployment in Afghanistan, Pittmann remained in touch with Rabani.  In February 2018, amid discussions about potential joint business opportunities, Rabani emailed Pittmann to say that he had been contacted by people who "needed a recommendation letter from an American supervisor," explaining that the letters were needed for Afghan applicants for Special Immigrant Visas (SIVs) to the United States and that "[t]hey will pay for it."

SIVs, established by federal statute, are designated for Afghan nationals who were "employed by or on behalf of the" United States or the North Atlantic Treaty Organization (NATO). Afghan Allies Protection Act of 2009, Pub. L. No. 111-8, § 602, 123 Stat. 807, 807. The program was designed to "provide[] an incentive for Afghans to seek employment with the United States" during the United States' mission in Afghanistan, which was difficult due to threats of reprisals from the Taliban or ISIS.[1] At the time of Rabani's request, SIV applicants needed to provide a letter of recommendation from an American supervisor during their period of employment for or on behalf of the U.S. military in Afghanistan. Such letters required a description of the applicant's work duties and an explanation of how the applicant "provided faithful and valuable service to the U.S. Government," as well as "any ongoing serious threat[s] . . . [the applicant is] experiencing as a consequence of [the applicant's] employment by or on behalf of the U.S. Government." These letters had to include the recommender's present "opinion on whether [the applicant] pose[d] a threat to

_____

[1] ISIS refers to the Islamic State in Iraq and Syria, a transnational jihad movement also known as the Islamic State in Iraq and the Levant, or ISIL. Islamic State in Iraq and Syria, Encyc. Britannica (Oct. 10, 2025), https://www.britannica.com/topic/Islamic-State-in-Iraq-and-the-Levant [https://perma.cc/7TRL-GC96]. Relevant here, the branch of ISIS that is active in Afghanistan and to which the parties refer is the Islamic State-Khorasan Province, also referred to as ISKP, ISIS-K, or simply ISIS. Id.

the national security or safety of the United States." For an SIV application to be approved, the recommender must have had personal knowledge of the facts and attestations included in the letter.

Responding to Rabani's request to provide SIV letters of recommendation, Pittmann emailed him asking, "Who is this for?" Rabani responded, "It's for my cousins. I have five of them to go. If you can do it, it will be good and they will pay for it." Rabani then supplied one cousin's name, the U.S. military contracts and project numbers he worked on, and "a recommendation letter format for [Pittmann's] review." Rabani also noted, "You can put the date from May 2015." Pittmann responded, "How much is he paying?" Rabani replied, "How much you want?" Pittmann proposed $2,500 per letter, and Rabani replied, "2,500 for a letter? Isn't it a lot, [hahaha]." Rabani then suggested $500 per letter, for a total of ten letters. Pittmann responded, "Okay. Send me the info."

Three months later, Pittmann emailed Rabani to ask what the applicants did for the U.S. military, stating, "I need to write something about what they did and where. Same goes for all the others. Otherwise, it doesn't look personal or professional." Rabani replied that "[t]hey were all translators, communicating and translating directly with U.S. Army and ISAF forces in Afghanistan at NKAIK, Bagram Airfield and Cam[p] Commando. Check the format I have sent a while ago. It's all written there."

- 4 -

Rabani later wrote, "Send me the soft copy. I will review it. If anything changes required, I will let you know." Pittmann then sent a draft letter. Rabani responded, "Yeah, it's good, but I guess if you could please use the attached format will be better. It's because this is the official format they accept the letter." Rabani also provided several other suggestions.

After a few more rounds of edits, Pittmann sent the letters via email to Rabani. About a month later, Rabani emailed Pittmann to request three more letters. Pittmann responded, "Okay. Send me the details. I will adjust the letters." Rabani sent back the letters, stating, "These are three new employees. Just hand-sign them, scan it, and send it back to me."

After these letters were finalized, Rabani emailed Pittmann again: "I received the payment from guys[,] waiting for your details so I can send you through Western Union." Pittmann responded, "That's good news. Let me know how it goes." Pittmann later wrote, "I need to write an invoice for the amount." Rabani responded, noting, "The last three, Islamuddin, Yama, and Bizhan, they will bring their payment as well. I have already adjusted their letters, so you only keep their details with you. I made your job easy, [hahaha]." Pittmann then asked, "which one of your companies do you want me to put on the invoice so it looks official," and Rabani responded, "Sunny Universe Construction Company." Pittmann then sent the invoice for "consultant

- 5 -

services," dated July 18, 2018, via email. After some difficulty transferring the money, on July 23, a $2,000 wire deposit arrived in Pittmann's bank account.

Rabani later asked if Pittmann had received emails from the National Visa Center requesting verification of the recommendation letters, to which Pittmann responded, "I have a bunch of them[.] Which names should I approve? I don't recognize them all." After Rabani provided the names, Pittmann verified his approval of the named applicants to the National Visa Center.

Almost all of the recommendation letters were substantially identical, containing the following and varying only the names and other personal details of the applicants:

> To whom it may concern,
>
> My name is Jeromy Pittmann and I am Engineer Officer for NSOCC-A which is located in Afghanistan until March 2015.
>
> I am writing this letter to recommend [Applicant] for consideration to the Special Immigrant Visa (SIV) program. [Applicant] has worked in support of United States army and NATO forces since July 2012 for a trusted local national company as a supervisor. I personally, have been supervising [Applicant] since 7 March 2014 up to 02 March 2015. During this time he has had excellent performance in all aspects of work and provided faithful and valuable service to the United States Forces in Afghanistan. I have known him to be a diligent, polite and hardworking individual.
>
> Just by being a supervisor to directly supporting United States army and NATO forces

his life is in jeopardy some of the extremist and Taliban consider him a traitor despite his hardship he always shows up for work. I do not see [Applicant] as a threat to the United States and in my opinion he would become a productive member of American society if allowed to emigrate. He is concerned for him and his family's safety once the NATO and U.S. pull out of Afghanistan. He has faced threats as a result of the employment and therefore he feels he will be a target of anti-government forces, and will be specifically targeted due to his work for the U.S.

In summary I highly recommend him for approval of a special immigration VISA (SIV) and I don't think he poses a threat to the national security or the safety of the United States of America.

The letters then listed the applicant's personal details and job title, as well as Pittmann's contact information.

**B.**

On November 28, 2022, a grand jury in the District of New Hampshire indicted Pittmann on four charges -- conspiracy to commit bribery and false writing, in violation of 18 U.S.C. § 371 (count I); bribery, in violation of 18 U.S.C. § 201(b)(2)(A) (count II); false writing, in violation of 18 U.S.C. § 1001(a)(3) (count III); and conspiracy to commit concealment money laundering, in violation of 18 U.S.C. § 1956(h), (a)(1)(B)(i) (count IV).

At trial, after the close of the government's case, Pittmann moved for a judgment of acquittal on counts I and III, on

the basis that there was insufficient evidence to show that the letters of recommendation contained false statements. See Fed. R. Crim. P. 29(a). The district court denied Pittmann's Rule 29(a) motion in a brief statement, explaining that it found, "after viewing the evidence on counts I and III in the light most favorable to the government's case, . . . that a rational factfinder could conclude beyond a reasonable doubt that the defendant committed the charged crimes."

On July 12, 2024, the jury found Pittmann guilty on all counts. Fourteen days later, on July 26, 2024, Pittmann renewed his motion for a judgment of acquittal, this time seeking acquittal on all counts. See Fed. R. Crim. P. 29(c). In his accompanying memorandum of law, he argued there was insufficient evidence to show his statements in the recommendation letters were "objectively false" and that all counts of conviction required falsity. He also argued that the State Department's requirements for SIV recommendation letters were ambiguous such that his responses were not false.

The district court held a hearing on Pittmann's Rule 29(c) motion and verbally denied it. First, the court stated that the government was only required to prove Pittmann made a false statement for count III, the false-writing charge. Thus, the court denied the motion "to the extent [] Pittmann [wa]s arguing" that such a requirement applied to all four charges.

Next, the district court stated it was "not persuaded by [] Pittmann's argument that to prove he made a false statement[,] the government was required to produce the testimony of the subjects of these SIV letters that [] Pittmann authored"; instead, the court found that there was sufficient evidence of falsity for the jury to convict on count III. The court further found that the State Department's questions were not ambiguous.[2]

On November 1, 2024, the district court entered judgment and sentenced Pittmann to thirty months' imprisonment. Pittmann timely appealed.

## II.

## A.

Pittmann first challenges his convictions on counts I through III, arguing that the government was required to prove falsity to convict on each count and that the evidence was insufficient in that regard.

The falsity requirement on which Pittmann focuses is derived from the false-writing statute, which subjects to criminal penalties anyone who, "in any matter within the jurisdiction of the [federal g]overnment, knowingly and willfully . . . makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry."

---

[2] Pittmann does not press his ambiguity argument on appeal.

18 U.S.C. § 1001(a), (a)(3). Under this statute, "the government must prove that the defendant (1) made a material, false statement (2) in a matter within the jurisdiction of the government (3) knowing that the statement was false." United States v. Vázquez-Soto, 939 F.3d 365, 371 (1st Cir. 2019). Pittmann contends that the government did not carry its burden on the first element; he argues there was insufficient evidence to prove beyond a reasonable doubt that the letters of recommendation he wrote contained false statements.

Because Pittmann raised this concern in his timely Rule 29(a) and (c) motions below, our review is de novo. United States v. Buoi, 84 F.4th 31, 37 (1st Cir. 2023). "In reviewing a sufficiency challenge, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found [that Pittmann made false statements] beyond a reasonable doubt." United States v. Falcón-Nieves, 79 F.4th 116, 123 (1st Cir. 2023) (quotation marks and citation omitted). "We evaluate the evidence in the light most favorable to the prosecution and draw all reasonable evidentiary and credibility inferences in favor of the verdict." United States v. Rodríguez-Martinez, 778 F.3d 367, 371 (1st Cir. 2015). In doing so, we must reverse if "the evidence . . . gives equal or nearly equal circumstantial support to theories of guilt and innocence." United States v.

- 10 -

Guerrero-Narváez, 29 F.4th 1, 9 (1st Cir. 2022) (quotation marks and citation omitted).

At trial, the government had two independent theories of falsity: first, that the letters were false because Pittmann never supervised the applicants; second, that Pittmann's statements about the applicants' character were false because at the time he wrote them, Pittmann did not remember the applicants' character. On appeal, Pittmann primarily takes issue with the former theory. But we think there was more than sufficient evidence for the jury to convict on the latter theory, such that we need not reach Pittmann's arguments about the insufficiency of proof as to whether he actually supervised the applicants.

The letters each attested to Pittmann's personal, present knowledge of the applicant, stating: "I have known [the applicant] to be a diligent, polite and hardworking individual." Each letter exploited and reinforced that assertion of personal knowledge by offering additional opinions about the applicant without any suggestion that the writer was simply parroting the opinions of others: the applicant "is" "efficient and attentive," "prompt," and not "a threat."

These statements were repeated essentially verbatim in twenty-two letters of recommendation. And at trial, the government presented emails from Pittmann in which he directly admitted to not "recogniz[ing] them all" and asked Rabani "which names [he]

should . . . approve." Combined with evidence that Rabani provided Pittmann with all of the names and information about each applicant, this was enough for a jury to have reasonably concluded that the applicants were not "known" to Pittmann and his opinions concerning them were not the product of such knowledge. By extension, this is sufficient evidence for a reasonable jury to conclude that the letters attesting to the applicants' character were false. Even accepting the possibility that Pittmann did, at one point, supervise the applicants in Afghanistan, a jury could find that he could not truthfully vouch in such detail for their character if he did not know who was who.

As a result, we hold that there was sufficient evidence for a rational jury to conclude beyond a reasonable doubt that Pittmann's letters of recommendation contained false statements, and we affirm Pittmann's conviction on count III on that basis. Because those statements are the same ones that Pittmann claims must be proven false under counts I and II, we need not reach his argument that those counts also required proving falsity, since we conclude that, even if they did, the evidence was sufficient to show those statements were false. We therefore reject Pittmann's argument for acquittal on counts I and II as well.

**B.**

Pittmann launches a separate challenge to his conviction on count II under 18 U.S.C. § 201, which makes it unlawful for any

public official to "corruptly . . . agree[] to receive or accept anything of value . . . , in return for . . . being influenced in the performance of any official act." 18 U.S.C. § 201(b)(2), (b)(2)(A). He argues that he was entitled to a lesser-included offense instruction on illegal gratuities. See Fed. R. Crim. P. 31(c), (c)(1) ("A defendant may be found guilty of . . . an offense necessarily included in the offense charged."). But Pittmann failed to request such an instruction below -- even after the district court explicitly invited comment on the jury instructions. And we have previously found arguments of instructional error waived where, as here, the "court invited edits" and counsel "unambiguously signified approval of the . . . instructions as given." United States v. Simon, 12 F.4th 1, 61 (1st Cir. 2021). At best, Pittmann might have been entitled to daunting plain-error review, yet he makes no effort on appeal to address the elements of that review. See United States v. Pérez-Greaux, 83 F.4th 1, 31 (1st Cir. 2023) (deeming an argument waived for failure to brief the prongs of plain-error review). We therefore find his belated request for a lesser-included offense instruction waived.

## C.

Lastly, Pittmann challenges his conviction on count IV under 18 U.S.C. § 1956(h) and (a)(1)(B)(i) for conspiracy to commit concealment money laundering. Together, these two provisions of

§ 1956 criminalize anyone who "conspires to" "conduct[] or attempt[] to conduct . . . a financial transaction" involving "the proceeds of specified unlawful activity" while "knowing" both "that the property involved . . . represents the proceeds of . . . unlawful activity" and "that the transaction is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of" such "proceeds." 18 U.S.C. § 1956(h), (a)(1)(B)(i).

Pittmann argues that this conviction must be overturned because the financial transaction for which he was convicted of conspiracy to commit concealment money laundering did not involve "proceeds of specified unlawful activity."

Pittmann did not make this argument below, so we review only for plain error.[3] See Pérez-Greaux, 83 F.4th at 31. To prevail under that standard, Pittmann "must show that (1) an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of the proceedings." Id. (cleaned up). As we explain

_____

[3] Because we conclude that Pittmann's arguments fail plain-error review, we need not reach the government's contention that, with Pittmann having raised only specific sufficiency-of-the-evidence arguments below, we should review only for "clear and gross injustice." See, e.g., Falcón-Nieves, 79 F.4th at 124 (quoting United States v. Ponzo, 853 F.3d 558, 580 (1st Cir. 2017)).

- 14 -

below, Pittmann does not show that any clear or obvious error occurred.

First, Pittmann contends that he was improperly convicted of conspiracy to commit concealment money laundering because the indictment charged the same conduct as both bribery and money laundering, thereby impermissibly merging those separate crimes. This was improper, he argues, because the funds cannot both become proceeds and be laundered as proceeds in the same transaction. To make this argument, he claims that the transaction charged as money laundering was the $2,000 payment from Rabani to Pittmann, that this is the "same transaction underlying the bribery," and thus that the indictment fails to allege "any secondary, 'independent manipulation' to conceal the funds."

But the conduct charged as conspiracy to commit money laundering in the indictment is not the payment from Rabani to Pittmann -- it is the agreement to "creat[e] a false and fraudulent invoice" disguising that payment as compensation for "legitimate consulting work." Like Pittmann's counsel below, we read the indictment to mean what it says: that it is this fraudulent invoice -- not the payment itself -- that underlies the concealment money laundering charge.[4] The creation of that invoice was a

---

[4] On appeal, Pittmann briefly addresses the false invoice by arguing that it "does not convert the payment for the letters into a money laundering transaction." But he does not argue that his

- 15 -

secondary, independent manipulation to conceal the nature and origin of the bribery proceeds and therefore presents no merger issue.

Nor does the actual payment from Rabani to Pittmann necessarily underlie Pittmann's conviction for bribery of a public official. To be found guilty of this offense, the public official must "directly or indirectly, corruptly demand[], seek[], receive[], accept[], or agree[] to receive or accept anything of value . . . in return for . . . being influenced in the performance of any official act." 18 U.S.C. § 201(b)(2), (b)(2)(A) (emphasis added). That crime was complete upon the reaching of an agreement for a quid pro quo in February 2018, well before any payment was issued or Pittmann took any steps to conceal that payment. See United States v. Brewster, 408 U.S. 501, 526 (1972) ("The illegal conduct is . . . agreeing to take money for a promise to act in a certain way." (emphasis added)); United States v.

---

generating a false invoice and sending it to Rabani -- the conduct alleged as money laundering in the indictment -- was not in and of itself a "financial transaction" under the meaning of the statute. See 18 U.S.C. § 1956(c)(4) (defining "financial transaction" for purposes of the money-laundering statute as "a transaction . . . involving the movement of funds . . . or . . . one or more monetary instruments, or . . . a transaction involving the use of a financial institution"). We therefore need not address any such argument. See Igartúa v. United States, 626 F.3d 592, 603 (1st Cir. 2010) (noting that "claims neither raised below nor on appeal" are waived).

- 16 -

McDonough, 727 F.3d 143, 152 (1st Cir. 2013) (quoting this language from Brewster).

It is true that "the laundering of funds cannot occur in the same transaction through which those funds first became tainted by crime." United States v. Richard, 234 F.3d 763, 769 (1st Cir. 2000) (quoting United States v. Butler, 211 F.3d 826, 830 (4th Cir. 2000)). But the conduct alleged here as money laundering -- the creation of a false invoice -- did not "first" taint the funds in question with crime. They were tainted from the moment a quid pro quo was agreed to -- and certainly before Pittmann took the separate, independent step of generating a false invoice to obscure the agreed-upon proceeds of that quid pro quo. Thus, Pittmann "was not doubly punished for" his subsequent steps to conceal the proceeds of bribery. United States v. Cardona, 88 F.4th 69, 80 (1st Cir. 2023).

Second, Pittmann argues that the false invoice he generated to conceal the $2,000 payment was not yet a financial transaction involving "proceeds" under § 1956(a) because he created and sent the invoice several days before the payment arrived. But we have previously rejected similar arguments, explaining that a defendant who "attempt[s] to conceal the source of the money before it actually c[o]me[s] into his possession" can still be subject to criminal liability. United States v. Misla-Aldarondo, 478 F.3d 52, 68 (1st Cir. 2007); cf. United States v.

- 17 -

Castellini, 392 F.3d 35, 48 (1st Cir. 2004) (noting that although "'the predicate offense[] must produce proceeds before anyone can launder those proceeds[]' . . . that does not require the two crimes involved to be entirely separate in time" (quoting United States v. Mankarious, 151 F.3d 694, 705 (7th Cir. 1998))).[5]  Thus, in Misla-Aldarondo, we held that a defendant who "took steps . . . to conceal" the receipt of extortion proceeds when such funds were in his co-conspirator's possession, but not yet his own, was liable for conspiracy to commit concealment money laundering.  478 F.3d at 68.  Here, as there, "[t]he transaction that created the proceeds -- the [quid pro quo agreement] -- is sufficiently distinct from the side transaction[] done to hide the trail" -- the sending of the false invoice -- thus rendering liability appropriate.  Id.; cf. Richard, 234 F.3d at 769-71 (applying the same analysis under § 1957(a)).

In enacting § 1956 "it is clear" that "Congress wanted to curtail" situations in which "money laundering of the proceeds of an underlying illegal activity may make the underlying crime more difficult to detect or to prove."  Castellini, 392 F.3d at

---

[5]  In Castellini, this court also recognized that proceeds "of an illegal activity may be created before the completion of an underlying on-going crime."  392 F.3d at 48.  While "[s]ome types of fraud, like bank and wire fraud, usually create proceeds only on execution of the first scheme," others can create proceeds earlier, such as mail fraud, which "can create proceeds before a mailing takes place."  Id.

49.  Here, a jury could reasonably infer that Pittmann crafted an invoice for "consultant services" that would "look official" in order to "conceal or disguise" the underlying crime of bribery. See 18 U.S.C. § 1956(h), (a)(1)(B)(i).  "His conduct was at the heart of what Congress sought to criminalize."  Castellini, 392 F.3d at 49.

We find there is no clear error here and therefore affirm Pittmann's conviction under § 1956(h), (a)(1)(B)(i).

## III.

For the foregoing reasons, we affirm the district court on all counts.